# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

# STATE OF MISSOURI

AT THE

## APRIL TERM, 1889.

---

THE STATE v. WENSELL, *Appellant.*

1. **Criminal Law:** EVIDENCE: DYING DECLARATIONS. A dying declaration is admissible in evidence where the declarant, at the time of making it, stated that he had no hope of recovery and made the statement upon the advice of his friend and medical attendant, although, at the time of being advised of his condition by the latter, he said he did not feel that he would die, but had confidence in his physician.

2. ———: MANSLAUGHTER IN THIRD AND FOURTH DEGREES. The evidence in this case examined and held that the defendant was entitled to instructions on manslaughter in the third and fourth degrees.

*Appeal from Ralls Circuit Court.*—HON. THOS. H. BACON, Judge.

REVERSED AND REMANDED.

( 137 )

*R. F. Roy* for appellant.

(1) The court should have excluded the testimony of Dr. Moore and John W. Taylor, detailing the supposed dying declarations of the deceased, as it does not appear that the deceased at the time was expecting an impending and almost immediate death, and it does not appear that the deceased had no hope whatever, but on the contrary, the declarations of the deceased show that he had not given up all hope, and when told that he was going to die, he said that he "did not feel that way," and it was six days before his death. *State v. Simon,* 50 Mo. 370; *State v. McCanon,* 51 Mo. 160; *State v. Dominique,* 30 Mo. 585; *State v. Rider,* 90 Mo. 54; 1 Greenleaf Ev., [8 Ed.] sec. 156, *et seq.; Whittaker v. State,* 3 S. E. Rep. 403. (2) The instruction in regard to manslaughter in the fourth degree, which was asked by defendant and refused by the court, should have been given. *State v. Davidson,* 95 Mo. 155; *State v. Partlow,* 90 Mo. 608; *State v. Berkley,* 92 Mo. 53; *State v. Wilson,* 85 Mo. 134; *State v. Barham,* 82 Mo. 67.

*John M. Wood,* Attorney General, for the State.

(1) The testimony of Dr. Moore, the attending physician, as having at his second visit informed deceased that his wounds would prove fatal, and that by his advice and direction arrangements were made to take deceased's dying statement, was objected to because too remote. The question of remoteness or nearness in time could only apply, so as to affect the competency of the declaration, to the time the arrangements for taking it were talked of or made, and the objection is untenable. (2) It was competent for the state to show, for the purpose of laying the foundation for admitting the statement made by deceased a few days before his death as a dying declaration, the condition of his mind at the time, his belief as to his approaching death and the basis for

such belief, and the objections to the testimony of witness Taylor were properly overruled. *State v. Simon*, 50 Mo. 370 ; *State v. Draper*, 65 Mo. 335 ; *State v. Kilgore*, 70 Mo. 546 ; *State v. Chambers*, 87 Mo. 406 ; Whart. Cr. Ev., secs. 279, 282. (3) Under the evidence, the defendant should have been convicted of either murder in the first or second degree or acquitted. The court therefore properly confined its instructions to those degrees of the offense and refused to instruct as to manslaughter in either degree. *State v. Hardy*, 95 Mo. 455 ; *State v. Ramsey*, 82 Mo. 138 ; *State v. Jones*, 79 Mo. 441 ; *State v. Sneed*, 91 Mo. 552 ; *State v. Anderson*, 86 Mo. 309 ; *State v. Anderson*, 89 Mo. 312 ; *State v. McDaniel*, 94 Mo. 301.

RAY, C. J.—Defendant was tried at the August term, 1887, of the circuit court of Ralls county, upon an indictment charging him with murder in the first degree for the killing of Jacob Young. Upon arraignment, he entered his plea of not guilty, and upon the trial was found guilty of murder in the second degree and his punishment assessed at imprisonment in the penitentiary for the period of thirty years. He has appealed to this court and assigns and urges several grounds for the reversal of the judgment, the first of which is that the trial court should have excluded the testimony of the witness J. W. Taylor, detailing the alleged dying declaration of the said Young.

That testimony is as follows, to-wit: John W. Taylor testified : "I reside in Perry, Ralls county, Missouri, and am a justice of the peace ; knew Jake Young ; Dr. Moore notified me that Jake Young wished me to go there and take his dying statement. I went there on the twenty-sixth of July, about four days after the cutting was done.

"Q. What, if any, conversation did you have with Jake Young concerning his near approaching death ?

" A.   I asked Mr. Young if he understood his con-
dition, that there was no hopes of his recovery.  He said
that he did from the statement of Dr. Moore."

The   defendant   here   objected   to   any   further
testimony of statements made by Jake Young as dying
declarations, on the ground that they do not appear to
be dying declarations but made six days before his
death, and it does not appear that the deceased knew
definitely that he was going to die.  The court over-
ruled the objection and the defendant excepted, and the
witness proceeded as follows :

"He appeared suffering severely, and the conversa-
tion was frequently interrupted, and he said that he
was sent for by Mr. Wensell to his place of residence to
come to Mr. Harvey Young's about eight o'clock at
night,  and  that  he  came  over  not  expecting  any
trouble ; that he came to Harvey Young's and went into
the living-room and sat down ; that Mr. Wensell came
out of another room and commenced at once to talk
rough to him ; called him a God-damned liar and son of
a b—h, and asked him what he should have said about
Miss Neva Young.   Mr. Young said that he told him
that he, Wensell, did say it, and that Wensell called
him a liar and made a pass at him.   That in the first
round their arms went up together ; that there was no
difference in the time of their striking.   He said that
he pushed Mr. Wensell and immediately they came
together ; that when they raised their arms he pushed
Wensell out from him, and immediately Wensell clinched
him and commenced cutting him.   He said that he
received a cut in the back and suddenly felt himself
deprived of the use of his limbs and sank to the floor,
and that he saw Wensell throw a knife out the window."

On cross-examination of this witness (Taylor), the
following questions and answers, among others, were
asked and given, to-wit :

"Q. You are a justice of the peace and notary public ?

"A. Yes, sir.

"Q. You went down to take his dying statement ?

"A. Yes, sir.

"Q. Did he say anything to you about why he wanted to make his dying statement ?

"A. Nothing more than I have detailed here, except that he was conscious that there was no hope of recovery ; and his friend had advised him to make it."

The principal reason urged in this behalf is that when said dying statements were made, said Young was not under the impression that his death was impending and inevitable. This is, we think, an important and perhaps difficult question under the facts as the same are now preserved in the record, and one we feel required to consider at some length. "Where the death is the subject of the charge, and the circumstances of the death are the subject of the declarations," the testimonies, usually denominated dying declarations, are receivable in evidence, and are generally said to be admissible upon grounds of public necessity, and for the reason that persons in certain expectation of almost immediate death may fairly be supposed, in this solemn situation, to have no motive to speak falsely, but to have on the contrary, strong motives to adhere to the truth and to speak without disguise or malice. 1 Chitty's Cr. Law, p. 569 ; Roscoe's Crim. Ev., p. 35. But these testimonies are, in all cases, to be received with the greatest caution, and this for obvious reasons often stated and which we need not restate at the present time. 1 Stark., p. 26.

The rule, as to their admission, is stated with some variety as to verbiage, but the meaning is, perhaps, substantially the same, that the declaration must be made under the expectation and settled conviction of death as the result of the wounds received and after all

hope of recovery is abandoned. Greenl. Ev., p. 208; Best's Ev., p. 913. It is the impression of impending and almost immediate death that makes the statements admissible, and any hope of recovery, however slight, renders them inadmissible. Greenleaf's Ev., p. 208; Best's Ev., p. 913; *State v. Simon,* 50 Mo., p. 374, and cas. cit. "And even the faintest hope of recovery" is a common form of expression employed in the authorities as sufficient for their exclusion. Best's Ev., p. 913, and cases cited in note; *Adwell v. Commonwealth,* 17 B. Mon. 310; *State v. Nash,* 7 Iowa, 347; *Commonwealth v. Densmore,* 12 Allen (Mass.) 537.

With these views and observations in view, we will now recur to the evidence, as preserved in the record before us, to ascertain if we can, the state of mind, under which said Young, afterwards deceased, made the statements or dying declarations in question. For this purpose, it is allowable and legitimate, and sometimes necessary, to consider the nature and extent of the wounds inflicted, as well as the conduct of the party at the time, and the communications, if any, made to him by his medical advisers. 1 Greenl. Ev., p. 208. The wounds, as described by the doctor, consisted of several cuts, which were inflicted by an ordinary pocket knife, the fatal one being described "as a transverse cut in the back between the third and fourth dorsal divisions. The knife first struck the spinous process and passed between the joints and severed the spinal cord." The point of the knife blade was taken by the doctor at the *post-mortem* examination from this wound which was necessarily fatal.

The difficulty or fight occurred about eight or nine o'clock in the evening and grew out of some damaging remarks which the deceased alleged defendant had made about a young lady. About two o'clock on the day after the difficulty, and some sixteen hours after his first call and visit to Young, Doctor Moore informed

him the wound, in his opinion, was fatal. After stating this announcement the doctor's testimony continues as follows:

"Q. State whether or not, from your statement to him, that he must die, whether he considered he must die?

"A. Jake Young said 'according to my feelings, I am not able to say whether I am going to die, but, doctor, what you tell me, I have confidence in, and I will look at my condition that way.' I told him that he would never get well—and his answer was that, as to his feelings, that he did not feel that way, but he would have confidence in my opinion, and from that time, he looked at it from that standpoint, that he must die. *He did not say that, he said I don't feel that way*, but I have confidence in you, doctor."

This testimony of Dr. Moore must be taken and considered in connection with that of J. W. Taylor, the justice of the peace hereinbefore set out, detailing his conversation with Young, the deceased, and then denominated his dying statement.

The question then is, does the said evidence make it plain that said Young was, when he made his statement, under a full realization that the solemn hour of death had come, and was impending and near and inevitable? It may be observed, that at no time, did the deceased, so far as appears, use any expression or make any sign indicating any apprehension of death, either immediate or remote, unless the terms he employed, as above to his physician and those used in his said conversation with Taylor, the justice of the peace, may be held to so indicate. Some such independent expressions, on the part of the declarant, are usually found, in the cases to which we have been referred, and have examined. For example, in the case of *State v. Draper*, 65 Mo. 335, the physician testified that he told deceased that there was no hope of his recovery and

that said Gilbert, afterwards deceased, believed what he told.   But in addition Gilbert also told Carter who testi- fied to the dying declarations "that he could not live till morning, or through the night."    In the case of *State v. Kilgore*, 70 Mo. 546, Willingham, subsequently deceased, said "I am dying, O Lord, I am dying," and repeated this several times.   In the case of *State v. Burns*, 33 Mo. 490, the deceased stated that he would not recover, that he was a dead man and could not survive, etc.    The court says that "he never entertained the slightest hope of recovery but labored under the settled conviction that his death was at hand."   In the case of *State v. Johnson*, 76 Mo. 124, the deceased stated that he could not live and that he must die, etc.

Under some authorities, it is held to be unnecessary that the deceased should have used any expression of his belief that he could not, or would not recover, provided his condition was itself such that he must have felt or known that he could not survive the injury.    Roscoe's Cr. Ev., ( 3 Ed.) p. 27.   So, too, it is sometimes said that if the person *in extremis* declares that he knows his danger, or it is reasonably to be inferred from his wounds and condition that he must be sensible of it, the declara- tions are admissible.   In others, where the attending surgeon has informed the declarant that his death must ensue, and the declarant has remained silent, making no explanation as to what he thought of his situation, the statements have also been received.    In one case which the surgeon did not think hopeless and so told the patient, but the patient himself thought otherwise, the declarations were received.   *Rex v. Mosley*, 1 Moody's Cr. Cas. 93.

Again, Greenleaf in his work on evidence, uses the following language :   "It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admis- sible.   *   *   *   On the other hand, a belief that he will

not recover, is not in itself sufficient, unless there be also the prospect of almost 'immediate dissolution.'" 1 Greenleaf's Ev., sec.158, and cases cited. Again, Roscoe, in his work on criminal evidence, cites a case where the declaration was made seven days before the death ensued and where the declarant said "he should never recover" and quotes from Hullock, B., the following : "The principle, on which declarations *in articulo mortis* are admitted in evidence, is that they are made under an impression of almost immediate dissolution. A man may receive an injury, from which he may think that ultimately he shall never recover, but that would not be sufficient to dispense with an oath." Roscoe's Cr. Ev., p. 33.

These citations present the subject in somewhat diverse views and must suffice. As before stated, the declarant made no explanation or declaration as to his situation, except in acknowledgment of the opinion, which the doctor communicated, and the further expression of confidence in his said physician, and, also, except such as may be found in what is styled his dying statement to the justice of the peace, Taylor. If we look to his actual condition at the time and his knowledge, and impression in that behalf, we find, in our judgment, about this state of facts : He had received, in point of fact, a wound, which was necessarily mortal, the spinal cord having been cut in two, but so far as the evidence shows, the doctor did not so inform him, and this fact was, we believe, not known to the doctor himself until discovered at the *post-mortem* examination, though he was manifestly aware of the injury to the spine by the said cut which he describes as mentioned above. The doctor, it may be added, attributes the death to blood poisoning as a secondary cause, the primary one being of course the fatal cut and wound to the spine. It may be observed that in this case death did not ensue for ten

days after the fight and four or five days, we believe, after the said declarations, so made as aforesaid to the witness Taylor. Whilst the length of time which transpires between the declarations and the death does not, it is true, determine the admissibility of the declarations, it is of more or less value as a circumstance bearing upon the belief of the deceased that his dissolution is, or is not, impending. 1 Greenl. Ev., 208. And it is said to be especially material where it is clear the deceased has not expressed his sense of his own situation. Roscoe's Cr. Ev., p. 33; 1 Phill. Ev., 298.

Further it appears that the doctor advised his patient to put his worldly matters in condition, but he did not it seems indicate to him how soon the fatal end might be expected. The most we think, we can say as to his state of mind is, that prior to the announcement by the doctor that the wound was mortal, he manifestly was under no apprehension as to his condition; the wounds themselves evidently did not impress him with the idea that he would die. It is natural that he should be startled and impressed with the statement of the physician, but even then his language, as we apprehend, does not indicate a full belief or realization that his death is impending or immediately near. He says in effect: "I have confidence in you, doctor, still I don't feel that way." From the form of the answer to the witness Taylor, in his examination in chief, we think he is in about the same frame of mind. He says he understands his condition, from the statement of Dr. Moore. On his cross-examination, however, Taylor, in reply to the following question: "Did he say anything to you about why he wanted to make his dying statement?" gave this answer: "Nothing more than I have detailed here; except, that he was conscious that there was no hope of recovery, and his friend had advised him to make it." If this answer is to be construed (and taken literally, it is susceptible of that

construction) that deceased said to him, that he (deceased) was conscious that there was no hope of recovery, that presents a stronger case. But even then, under the current of authorities, that alone is not sufficient, unless it is also coupled with a personal sense, or apprehension of impending and inevitable death, such as the law requires. It may be true, that deceased was conscious that there was no hope of ultimate recovery ; but the question is, was he conscious that death with all its solemnity was then, at the time of speaking, impending and inevitable within the meaning of the rule in question? To the same effect is the recent case of the *State v. Partlow*, 90 Mo. 609, 629.

Speaking for myself only, I am of opinion that he was not and that the admission in evidence of the declaration in question was error, but a majority of my associates, BLACK, BRACE and BARCLAY, JJ., are of a different opinion, and it is accordingly held that no error was committed, in this particular.

The court instructed the jury as to murder in the first and second degrees and self-defense and refused to instruct as to manslaughter in the fourth degree. The court also gave the following instruction, at the instance of the state and over the objection and exception of defendant, to-wit: "The court instructs the jury that the defendant, Edward M. Wensell, stands charged of murder in the first degree, and under the evidence in the case, the jury must convict the defendant of murder in the first or second degree, or acquit him on the ground of self-defense."

There had been, as shown by the record, for some time ill-feeling between the parties, and there is evidence of previous threats made by both. The bad blood it seems originated in the first instance in a transaction about some ties, and over some remarks which defendant claimed deceased had made about him in that connection. But the difficulty, on this occasion, grew out of some vicious remarks, which deceased claimed to

have heard defendant make about Miss Neva Young in respect to defendant's object, in paying his attention to her. This remark deceased reported to Mrs. Young, the mother of Neva, and she informed defendant that he had been talking indecently or slanderously about her daughter. Mrs. Young, who testified for the state, says that Young says he would face the defendant about it the first time they met there and that she told defendant.

There is evidence that during the day defendant was seeking the deceased, and that being asked, about four o'clock, to go to meeting that evening, he declined saying he was going to have one of the damn'dest meetings ever had in that bottom. About night, defendant, it seems, went back to Harvey Young's house, finding Mrs. Young and Miss Neva Young and some others there. Word was, it seems, sent to deceased to come down to Young's. Defendant, it seems, thinking that deceased was not coming, and having been invited to stay all night, had gone into an adjoining room to go to bed. About this time, which was eight or nine o'clock, deceased came into the main room where Mrs. Young and her daughter and Miss Tumbo were, and sat down, entering into conversation with them. The defendant heard him come in, or talking and remarking "he has come, we will settle that matter now," and put on the clothes he had partly removed, and went at once into the main room advancing towards the deceased and cursing him, asked him about the scandalous talk referred to. Deceased replied, and stated the remark he had charged the defendant with making, and defendant said it was a God-damned lie. Each gave the other the damned lie. The evidence leaves it somewhat doubtful which struck first; they evidently struck about the same time, and then clinched, and in a few moments deceased fell to the floor with defendant on top of him. Harvey Young pulled defendant off and testified that he

said to defendant, "Let loose of him, damn you, you have cut him all to pieces," and that defendant said "No, I ain't got no knife." Defendant had thrown his knife out doors through the window, where it was afterwards found. The deceased was not armed. There is evidence tending to show that defendant did not take his knife from his pocket and open it after the fight began, but must have had it opened beforehand.

Defendant testified in his own behalf, and as to the immediate occurrence, in substance as follows : "When Jake came, I was sitting on the foot of the bed with my shoes off. I said 'Jake has come, and we will settle the difficulty and see who has told the lie.' I put on my shoes and walked through the door, and said 'Good evening, Jake ;' then I said 'Jake, what kind of damned scandalous talk is this you have accused me talking about Miss Neva Young ?' He said, ' I don't know.' I said 'And I also understand that you say I might as well have put my hands in your pocket and taken out five dollars as to do the way I did about those ties, but I care nothing about that.' He said, 'You did talk wrongfully about her.' Says I, 'Please state what I said.' By this time I had walked up by the door and placed my left hand on my hip, and he raised up and threw himself in this position facing me. He faced around then and put his right hand in his right hip pocket, and his left hand resting on the left hip. Then he stepped out in my face and said, 'You did talk about her.' Says I, 'Please state what I said ?' Says he, 'Do you want me to tell it right here ?' I said 'I do ; you have told it to these parties once and you can tell it again.' He said that it was down at his shanty one evening when he told me what I said. Says I 'Jake Young, I did not say it.' He says, 'You did,' and I said 'You are a base liar.' He then jerked his hand from his hip, threw it up and struck over his shoulder. I caught his first lick with my left arm, and struck him

a glancing blow, and struck him back against the door. I drew my knife and struck him two or three times. I could not say where I struck him. He had a good hold and I could not wrench out of his grasp. He caught me around the neck and drew me down to him awhile before I broke his hold. I supposed at the time the fight commenced that he would kill me. I didn't know whether he was armed or not. I fought in order to protect my life with all the vengeance that was in me, because I thought it was for my life. I then left the neighborhood on foot."

Under the authority of *State v. Partlow*, 90 Mo. 608, this defendant was entitled, under the facts of the case to an instruction on manslaughter in the fourth degree, and its refusal was, therefore, error. We are also of opinion, that defendant was entitled to an instruction on the third degree of manslaughter. For the reasons hereinbefore stated the judgment of the trial court is reversed, and the cause remanded for further proceedings in conformity herewith. BLACK and BRACE, JJ., concur; BARCLAY, J., dissents; SHERWOOD, J., absent.

