## THE STATE v. WEAKLEY, Appellant.

### Division Two, December 9, 1903.

1. **Homicide:** INSTRUCTION FOR MANSLAUGHTER. Where the killing was intentional, but done in a heat of passion on a reasonable provocation without malice and without premeditation, and under circumstances which do not constitute it justifiable or excusable homicide, the court should give an instruction for manslaughter in the fourth degree.

2. ———: ———: PASSION. The passion which will reduce the homicide to the grade of manslaughter is an excited state of the mind, produced by some lawful provocation, such as a blow, or an assault upon the person.

3. ———: ———: ———: REASONABLE PROVOCATION: MANSLAUGHTER. It is the duty of the court in a criminal case to instruct the jury upon all questions of law arising in the case. And where there is evidence tending to show that the deceased assaulted defendant and struck him over the head with a revolver just before defendant shot him, the court should give an instruction on the subject of manslaughter in the fourth degree, for that assault, if true, was reasonable provocation, and tended to arouse that heat of passion which negatives malice, and whether it did so or not is a question for the jury to decide. And if the court fails to give such an instruction, after its attention is called to the fact that it had failed to instruct upon all the law of the case, its failure will be reversible error.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

REVERSED AND REMANDED.

*Jno. A. Gernez* for appellant.

(1) A homicide committed without malice and in hot blood engendered by adequate provocation, though with lethal instruments, and intentionally, is but manslaughter in the fourth degree. State v. Reed, 154 Mo. 130; 2 Bish. New Crim. Law, sec. 699; 1 McClain Crim.

Law, sec. 336; Wharton on Homicide, secs. 430, 431; 2 Roscoe's Crim. Evid. (8 Ed.), 966; State v. Hill, 4 Dev. & B. (N. C.) 491; State v. McDowell, 32 Vt. 541; 1 East P. C. 233, 234, 235; 4 Black. Com. 191; 2 Bish. Crim. Law, secs. 695, 697, 699, 701; State v. Bowles, 146 Mo. 15; State v. Garrison, 147 Mo. 556; State v. McKenzie, 102 Mo. 632; State v. Edwards, 70 Mo. 480; State v. Watson, 95 Mo. 411; State v. Gartrell, 71 S. W. 1025.    (2) It was error in the trial court to fail to instruct on manslaughter in the fourth degree under the evidence.    Authorities supra.

*Edward C. Crow,* Attorney-General, and *Bruce Barnett* for the State.

(1) (a) Appellant did not ask the court to instruct the jury on all points of law arising in the case. To the instructions given by the court he saved exceptions as shown in the following words: ''To the giving of which instructions the defendant then and there duly excepted as not fully setting out and instructing the jury upon all the law in the case.'' If appellant desired further instructions, he should have either offered them or asked the court to instruct the jury upon all the law of the case.    The only difference between a civil and a criminal case in this regard is that in a civil case the party must ask for each particular instruction which he may desire, while in a criminal case the request may be in general form.    State v. Meadows, 156 Mo. 110; State v. Waters, 156 Mo. 132; State v. Palmer, 161 Mo. 152; State v. Huff, 161 Mo. 459; State v. Norman, 159 Mo. 531.    And this rule has not been changed by section 2627, Revised Statutes 1899. State v. Vinso, 171 Mo. 576.    (b) Nor can this court review the instructions which were given in this case, no objection having been made, nor exception saved thereto, on account of errors therein, but only because of the alleged fact that there were not enough of them.    In other words, the error claimed by appellant was one

of omission and not commission. (2) (a) Appellant complains in his motion for new trial that the court erred in failing to instruct the jury on manslaughter in the fourth degree. The State's evidence showed a killing done premeditatedly and with malice aforethought, and the defendant swore to a state of facts which, if true, would make out a case of self-defense. There was no room for middle ground and no evidence to call for an instruction on manslaughter in the fourth degree. To have given such an instruction would have furnished the jury an opportunity of returning a compromise verdict not based upon any evidence, and would have been as prejudicial to the defendant as to the State. State v. Sumpter, 153 Mo. 436; State v. Renfrow, 111 Mo. 589; State v. Smith, 114 Mo. 406; State v. Brady, 87 Mo. 142; State v. Lane, 64 Mo. 319; State v. Johnson, 76 Mo. 127; State v. Dunn, 18 Mo. 419; State v. Hollingsworth, 156 Mo. 178; State v. Meadows, 156 Mo. 110. (b) But since the defendant asked for no instruction on manslaughter in the fourth degree, he can not now complain, regardless of whether he was entitled to such an instruction. State v. McGinnis, 158 Mo. 105; State v. West, 157 Mo. 309; State v. Weber, 156 Mo. 249; State v. Pitts, 156 Mo. 247.

*Jno. A. Gernez* for appellant in reply.

(1) The proposition laid down by respondent in the first point of his brief, is not now nor has it ever been the law of this State, nor is such the doctrine enunciated by the cases cited. To the contrary, they prescribe the manner which shall be proper for a defendant in excepting to inadequate instructions, and this manner is identically the one defendant used at the trial. Defendant properly saved his exceptions at the time the court gave its instructions, and subsequently when the motion for a new trial was overruled. (2) The cases cited to the second point of respondent's

brief are undoubtedly correct enunciations of law as to instructing on manslaughter, as far as these particular cases are concerned. They simply hold that no instruction for manslaughter is warranted unless there is evidence upon which to base such instructions. That is admittedly the law. But appellant insists that in the present case the evidence of the defendant and of other witnesses detailed a condition where all the facts in evidence not only warranted such instruction but failure to give it by the court was grievous error. Whether such instruction is warranted must be determined by the trial court in view of all the evidence. The error complained of is that the trial court entirely disregarded such evidence in determining upon the instructions.

BURGESS, J.—Defendant was convicted of murder in the second degree, and his punishment fixed at ten years' imprisonment in the penitentiary, for having shot and killed with a pistol one John Fox in the city of St. Louis on the evening of December 25, 1901. The case is before us upon his appeal for review.

Both defendant and deceased were negroes. The killing occurred at a negro clubroom in said city, of which both parties were members.

William Fox, a brother of the deceased and acting vice-president of the club, testified on behalf of the State substantially as follows:

That at about half past eight in the evening of Christmas day he was at the clubrooms when Clarence Weakley, the defendant, came in, and witness said to him, "I told you about your treating me; it isn't right the way you have acted, shooting here," and that defendant replied, "What shooting?" and witness said, "You done it;" and defendant answered, "I have done it and what are you going to do?" and witness said, "There is nothing to do but to go out and stay out;" whereupon defendant put his hand back to his pocket

as if to draw a pistol, and upon this witness's brother, John (the deceased) stepped into the room and pointed a gun at the defendant saying: "Chance, don't do that, I am bound to protect his life;" and Chance replied, "I have not got nothing." Deceased wanted witness to search defendant, but witness said, "I never took advantage of no one. I am not going to run from him." The defendant then said that he "didn't have nothing," and witness said, "Let him go, John." The deceased then put up his gun and said to the defendant, "Don't think hard of me for what I have done; I haven't done anything but what you would do for your brother." Defendant then said, "That is all right, John." The deceased then walked into the next room, but a moment later said to the defendant, "Chance, I can talk to you," and defendant replied, "Certainly." The deceased and the defendant then walked out into the hall and in four or five minutes deceased returned saying, "Everything is all right." And the defendant said, "Everything is all right with me and him, John." The deceased then turned his back, and the defendant fired two shots at deceased, which took effect in the head and jaw. He fell in witness's arms, and as far as witness could tell, died almost instantly. At the time deceased was shot he had in one hand a cane, which he carried as a regular habit, having become crippled some time before, and in the other hand a cigar, which he was smoking. Witness did not see defendant at the time the first shot was fired, but he did see him as he fired the second shot, defendant having gotten to the door by that time. Immediately after this occurrence defendant turned and ran away and was seen no more about the clubrooms. Just before defendant fired the shot he said, "Yes, it is all right with me, John."

Malcolm Powell, who was at the club at the time of the shooting, testified in substance that the defend-

ant came to the clubrooms that night with some other parties and witness's brother; Will Fox told defendant that he had mistreated him, shooting off his gun, and that if he could do no better he wished he would stay away; that he would.do him a great favor by doing so; words became very hot, causing witness to quit playing cards, and to go.to the room where they were in time to hear defendant say to Will Fox, "Well, I have done, it, what are you going to do about it?" to which Will Fox replied, "I can do nothing but tell you to stay away;" that defendant then stepped back and made a motion as if to draw a gun from his pocket, whereupon witness's half-brother, John Fox, the deceased, stepped in and lowered a pistol at the defendant with these words, "Don't do that, Chance, I am saving my brother's life and at the same time protecting your life." The defendant then said, "I have not got anything, I have not got any gun." The deceased then walked into an adjoining room, but very soon returned and said to the defendant: "Chance, I haven't done anything more than you would do for your brother. I am protecting my brother's life and yours at the same time. I don't want you to think hard of me, I have not done anything more than you would do, can't I talk to you?" and to this defendant smiled and answered, "Yes." Defendant and the deceased then went out into the hall to talk, and soon the deceased returned saying, "Everything is all right, ain't it, Chance?" and Chance said, "Yes, everything is all right with me." Just as deceased stepped over the doorsill witness heard a shot fired, and defendant then stepped just inside the room and fired a second shot, and deceased fell across the door; the defendant turned and ran away.

Galvin Granch, a member of the club, was at the club on that evening, and heard Will Fox saying to the defendant, "When you come here shooting as you did to-day, you know it gives us trouble, the police are

around where there is shooting, and it will draw the police. I don't like that way of doing and if you want to do that you will have to stay away;" and heard the defendant reply; "It is done, and what are you going to do about it," to which Will Fox responded, "I am not going to do anything, but you can walk out if you don't behave yourself." This conversation continued and defendant started "kind of walking sideways" with his hand at his pocket and saying, "I don't think you have treated me right;" at this point John Fox, or deceased, came in and said, "Throw up your hands," and told Will to search him, but Will said, "No, I won't search any one; I don't believe in taking advantage of anyone; I believe in treating everybody right and I want them to treat me right. Put the gun up and come back in here." Deceased then put up his gun and a moment later said to defendant, "Weakley, come into the hall, I can talk to you in here, there is no use having trouble." Deceased and defendant went out into the hall and returned in about five minutes, at the end of which time witness heard deceased say, "It is all right with you, Chance." Chance answered, "Yes." Witness then thought that the trouble was over, but about three minutes later two shots were fired, and he looked and saw John Fox fall into his brother's arms, and then on to the floor, just inside the door.

These witnesses testified that during the conversation in the hall there was no loud or exciting talking.

James Massey, a police officer, hearing the pistol shots, hastened to the club, and found the deceased lying on the floor with a bullet wound in his head, the end of the bullet sticking out of the forehead; he had no pistol on his person.

D. F. Hochderfer, a physician, testified that upon a postmortem examination by the coroner at the morgue, he found that the bullet had gone through the defendant's head from behind, coming out at the fore-

head, and another through his jaw, entering at the rear and coming out in front.

Police officer J. J. Gordon, who put the defendant under arrest soon after the occurrence, testified that the defendant said that he had lost his pistol while running through the alley; that they had chased him and he lost his gun; that John Fox had stuck a revolver at his stomach and made him throw up his hands and then hit him over the head and that then he (the defendant) shot him (Fox). On cross-examination this witness testified that there was a mark or bruise on the side of the head of defendant. That defendant said that John Fox stuck a revolver at his stomach and made him hold up his hands and then he hit him (defendant) over the head.

Charles Weinstock, a witness for defendant, described defendant's entry into the clubrooms and the reprimand administered to him by Will Fox. He related how, in the meantime, John Fox had held a whispered conference with his half-brother, Malcolm Powell, and was handed something by the latter, which John Fox put in his pocket; how John Fox then walked into the hall from the second room and in a second reappeared, coming into the buffet, saying, "Throw up your hands, you s— of a b—." A few words ensued, whereupon John Fox said to the defendant, "Come on out here in the hall; I am not through with you yet," at the same time catching defendant by the coat and pulling him out into the hallway. Previous to that the witness had heard words in the hall but could not distinguish what was said. Immediately after the shots he saw John Fox run into the buffet with a revolver in his hand. Both shots were fired in the hall, neither in the buffet.

Benson Cobbs, another witness for the defendant, was in the buffet when the defendant arrived. He narrated the conversation between defendant and Will Fox, and then described how the deceased came in

from the hallway and "stuck a gun in defendant's stomach," and told him to throw up his hands. After some conversation, the deceased walked into the adjoining room and returned, saying: "Chance, come here; I want to talk to you. Can I talk to you?" to which defendant answered: "Anybody can talk to me." They went out into the hall, and were there for five minutes.

By defendant's counsel: "Did you hear anything? A. I went out into the hall and I heard something hit, like somebody was hit across the head with a gun or stick, and then I heard two shots in rapid succession, and then John came falling in the door, with a gun in his hand."

Lee Houston, who was also present when defendant entered the clubrooms, in the "dancing-room," as witness calls it, gives his account of the occurrences. He heard loud words in the buffet. He saw John Fox come from the hall into the buffet, and heard him say to the defendant: "Throw up your hands." After some additional words, John Fox told the defendant to walk out into the hall; that he could talk to him better there, which the defendant did, and John Fox followed him; and John Fox said to the defendant (quoting the witness's words): "He said, 'I am not going to let you kill my brother,' and he said, 'I am not going to kill your brother;' he said, 'That is all right,' and John Fox struck at Chance, and he ducked; and when he got to the door he kept his hand in his pocket, and whether he pulled it out of his pocket after he struck at him, I don't know; I would not be sure."

Chance Weakley, the defendant, called in his own behalf, testified as follows:

There had always been a friendly feeling between the Fox brothers and himself. On Christmas evening at about eight o'clock he, with Ed. Williams and Charles Weinstock, went to the club, of which he was a member. As he started to enter the clubrooms, his

companions went in, but he was stopped by Will Fox, who upbraided him for an occurrence of the morning. In the meantime John Fox appeared and pulled a "gun" on him. There was some more argument, and then John Fox seized defendant by the coat, saying, "'Come on out here, I am not through with you yet."

By defendant's counsel: "You went outside? A. Yes, sir. How far did you go outside? A. Coming out like this is the door, it is twice the distance where that corner is, and he takes me clean back to the corner of the hall and nobody in room can see anything.

"Q. You went clear back to the angle? A. Yes, sir.

"Q. What were you talking about? A. There was no talking, he takes me out there and says to me when he turned me loose, 'That is all right,' and smashes me—

"Q. With what? A. A Colt's pistol.

"Q. Did you have a hat on? A. Yes, sir.

"Q. Did it leave any mark? A. No, sir; I had a new stiff hat on and it bursted it to pieces; if it had not been for that, it would. When he hit me I ducked down and when I come up I shot before I straightened up.

"Q. What was your purpose in shooting? A. To keep him from killing me; I was frightened; I was trying to get away from him."

On his re-direct examination defendant stated the blow so received left a mark on his face.

The court instructed for murder in the second degree, and self-defense, but not as to manslaughter.

To the instructions given the defendant at the time duly excepted because of the failure of the court to instruct the jury upon all the law of the case. It is now insisted that the court should have instructed for manslaughter in the fourth degree, and in failing to do so, committed reversible error.

No criticism is made upon the instructions that were given further than as we have indicated.

It is clear from the testimony that the killing was intentional. The defendant was therefore guilty, under the evidence, of murder in the second degree, or of manslaughter in the fourth degree, unless the homicide was justifiable. It has been said that under our statute manslaughter in the fourth degree includes every homicide not justifiable or excusable which was manslaughter at common law, and which is not excusable or justifiable, or is not declared by statute to be manslaughter in some other degree. [State v. Edwards, 70 Mo. 480; sec. 3477, R. S. 1889, State v. Watson, 95 Mo. 411.] Therefore "if the party act upon sudden passion, engendered by reasonable provocation, the existence of malice will be negatived and the killing, though intentional, will be manslaughter in the fourth degree." [State v. Curtis, 70 Mo. 594.] But in order to reduce the offense from murder to manslaughter, the killing must be done in a heat of passion on a reasonable provocation without malice and without premeditation, and under circumstances that will not be justifiable or excusable homicide. And the passion which will reduce homicide to the grade of manslaughter is an excited state of the mind produced by some lawful provocation, such as a blow, or an assault of any kind upon the person. [State v. Ellis, 74 Mo. 207.]

It was the duty of the court to instruct the jury upon all questions of law arising in the case which were necessary for their information in giving their verdict (sec. 2627, R. S. 1899), and as there was evidence tending to show that the deceased assaulted the defendant and struck him over the head with a revolver just before defendant shot him, which if true was certainly reasonable provocation, as it must have tended to arouse that heat of passion which negatives malice, and whether it did so or not should have been submitted to the jury, and the court erred in failing to so

do, when its attention was called to the fact that it had failed to instruct the jury upon all the law of the case under the evidence.

For these intimations the judgment is reversed and the cause remanded. All concur.