# THE STATE v. WILLIAM H. CONLEY, Appellant.

### Division Two, February 17, 1914.

1. **INFORMATION: Felonious Infliction of Fatal Wound.** Where an information for murder charges the assault was made feloniously, wilfully, deliberately, premeditatedly and of malice aforethought, that the using of the pistol was likewise done feloniously, etc., and that the shooting and striking of deceased with the leaden bullet in and upon a vital part of his body was also done feloniously, etc., and those charges are followed by a proper conclusion, it sufficiently complies with the constitutional guaranty that the defendant is entitled to "demand the nature and cause of the accusation against him," even though it may fail to affirmatively charge that the giving or inflicting of the fatal wound was done feloniously, wilfully, premeditatedly, etc.

2. **INSTRUCTION: None for Manslaughter: Failure Properly Saved.** Where the motion for a new trial specifically urges error on the ground that the court failed to instruct on manslaughter in the fourth degree, and at the time the instructions were given defendant objected and saved an exception because the instructions "did not declare all the law necessary to a proper determination of the case on the issues raised by the evidence," the point that the trial court erred in failing to instruct on manslaughter in the fourth degree is properly saved for review, although at the time the instructions were given defendant did not specifically object to the failure of the court to give such an instruction.

3. ————: **For Manslaughter in Fourth Degree: When Necessary.** If the defendant act upon sudden passion, engendered by reasonable provocation, the existence of malice will be negatived, and the killing, though intentional, will be manslaughter in the fourth degree. The intentional killing of another, without malice, on sudden quarrel, or in heat of passion, is manslaughter. So that where defendant and deceased, in amity and peace, in the nighttime, started home from a country dance, and had gone about one hundred and fifty yards when the noise of a fight reached them, and they hurriedly turned back, and on reaching the scene found a relative of deceased on the ground and another on top of him, and deceased told such other to get off and let the relative up, which was done, and instantly trouble arose between defendant and deceased, in the course of which deceased took hold of defendant, shook him, cursing all the time, and began to cut his clothes and

hands, if his testimony is to be believed, and also drew forth a pistol, when defendant immediately shot, there was such evidence as required an instruction on manslaughter in the fourth degree.

Appeal from Ozark Circuit Court.—*Hon. John T. Moore*, Judge.

REVERSED AND REMANDED.

*Fred Stewart* and *T. J. Luna* for appellant.

*John T. Barker*, Attorney-General, and *W. M. Fitch*, Assistant Attorney-General, for the State.

(1)    The information is good.    Kelley's New Criminal Law & Practice (3 Ed.), sec. 474; State v. Stacey, 103 Mo. 11; State v. Wilson, 172 Mo. 420. (2) The last assignment of error is that the court erred in failing to instruct on all questions of law in the case, and especially in failing to give an instruction on manslaughter in the fourth degree. From a hasty examination of the record it seems that the court would have been justified in giving this instruction. The only question is whether or not the refusal is reversible error. The evidence in this case tends to show that the defendant had learned of threats made against him by the deceased, and it also shows that at the time the fatal shot was fired the deceased and defendant were scuffling, were engaged in conversation, possibly a quarrel. Under this state of the evidence was it mandatory on the court to give an instruction on manslaughter in the fourth degree? State v. McKenzie, 177 Mo. 699; State v. Clay, 201 Mo. 687.

FARIS, J.—From a conviction of defendant of murder in the second degree in the circuit court of Ozark county, he appeals. The jury fixed his punishment at ten years' imprisonment in the penitentiary. The information upon which the conviction was had

becomes important because of the attack made there-
on by defendant in his motion in arrest of judgment.
The defendant is neither represented in this court by
any brief nor did learned counsel who represented him
below appear in oral argument in his behalf.  We are
left, as best we may, to eke out in the light of the mo-
tion for a new trial and the motion in arrest of judg-
ment whatever errors, if any, we may be able to dig
out of the record.

By reason of the attack made upon the informa-
tion it becomes necessary to examine it.  Omitting
caption and formal parts (touching which there is no
controversy), this information is as follows:

"Geo. W. Boone, prosecuting attorney within and
for the county of Ozark and State of Missouri, informs
the court that William H. Conley on or about the 26th
day of December A. D. 1912, at the said county of
Ozark and State of Missouri, did then and there in
and upon one Ed Conley then and there being, felon-
iously, wilfully, premeditatedly and of his malice afore-
thought, did make an assault, and with a dangerous
and deadly weapon, to-wit, a revolving pistol, then
and there loaded with gunpowder and leaden ball, which
he the said William H. Conley, in both his hands then
and there had and held, at and against him, the said
Ed Conley, then and there feloniously, on purpose and
of his malice aforethought, wilfully, premeditatedly
and of his malice aforethought, did shoot off and dis-
charge, and with the revolving pistol aforesaid, and
the leaden ball aforesaid, then and there feloniously,
on purpose and of his malice aforethought, wilfully and
premeditatedly, did shoot and strike him, the said Ed.
Conley in and upon the face and head of him, the said
Ed Conley, giving to him the said Ed Conley, then
and there with the dangerous and deadly weapon, to-
wit, the revolving pistol aforesaid, and the leaden ball
aforesaid, in and upon the face and head of him the
said Ed Conley one mortal wound, of which mortal

wound the said Ed Conley from the 26th day of December, 1912, until the 8th day of January, 1913, in the county aforesaid, did languish, and languishing did live, on which said 8th day of January, 1913, in the county aforesaid, of the mortal wound aforesaid, died; and the prosecuting attorney aforesaid upon his oath aforesaid, does say, that the said William Conley, him the said Ed Conley, in the manner and by the means aforesaid, feloniously, wilfully, premeditatedly and of his malice aforethought did kill and murder, contrary to the statute in such cases made and provided, and against the peace and dignity of the State.''

It is urged in at least three assignments of error, in the motion for a new trial, that the court did not properly declare the law; that it refused proper instructions, and specially, that it erred in failing to instruct the jury on manslaughter in the fourth degree. This point is properly preserved in the record, and since it is the only very serious point in the case, we would as well now give the testimony upon which this request of defendant was bottomed:

One Lum Bell, testifying for the State, among other things pertinent to the question of whether or not an instruction for manslaughter in the fourth degree should have been given, said:

''Q. Tell the jury what Ed and Bill were doing? A. Well, they [Owen Driscoll and Aleck Hicks] had a little fight there at the house and we was outside the yard fence by a little fire we had built and Ed and Bill had hold of each other and jerking each other just like they was trying to make each other behave, and go home and just then the pistol popped and Ed fell. They were cursing but it didn't seem like they was cursing each other, but each was cursing the men that was fighting. They seemed to be trying to quiet each other.

''Q. They didn't seem to be mad at each other? A. No, sir.''

Sol Moffis, testifying for the State upon the question here, said:

"Q. I will ask you if you didn't see Ed make a grab or a lick at Bill? A. No, sir, he just took him that way (indicating) and kinda shook him and said he was a fighting s—of—a-b—.

"Q. They talked there something like a half a minute? A. It might have been a half a minute, I don't think it was over that.

"Q. And then the pistol fired? A. Yes, sir. . . .

"Q. How many minutes after you seen Ed take hold of Bill until the pistol fired? A. He says: 'Bill Conley, I am a fighting s—of-a-b—,' and *he about got the words out when the pistol fired.*"

Jim Stephens, a witness in behalf of defendant, among other things, said:

". . . . He turned and kinda threw himself toward Bill and they kinda catched hold of each other and the crowd kinda got between me and them and then they hollowed, 'Turn me loose and don't hold me—' (interrupting):

"Q. Which one was that? A. It was either Ed or Bill one, I couldn't tell which, and about that time the pistol fired and Ed fell."

The above excerpts are all that any witness (except defendant himself, to whose testimony reference will be hereafter made), either for the State, or for the defendant, said which is pertinent upon the contention that an instruction for manslaughter should have been given. It may be with fairness stated that in all of the testimony of the several witnesses, both for the State and the defendant, there is.nothing else which even tends to show that the killing was not either murder in the second degree, or absolutely justifiable on the ground of self-defense.

The defendant, testifying for himself, which he did at great length, undertook to explain fully all of the facts and circumstances immediately preceding and

occurring at the time of his shooting deceased. His testimony touching the facts which bear upon the necessity *vel non* for an instruction on manslaughter, and upon which such instruction must be bottomed, if it were required to be given, was as follows:

"Ed came back around and took Stephens and jerked him around and swore he was the 'fightingest s—of-a-b— that ever seen that place,' and he turned Stephens loose and grabbed me and when he grabbed me it wasn't until just a little bit until I felt something cutting and tearing my coat, and I says: 'What are you doing, Ed; my gracious, don't do that.' I thought it was a knife and he gave me another blow and I told him still to quit, and I begun trying to get away from him. He had me by the breast of the coat and I finally slapped the knife out of his hand and he cut me right there on the left hand and when I slapped the knife out of his hand he says: 'God damn you, I can get you,' and he got his gun clear up out of the overalls, that is up that way (indicating) and my gun fired and he fell, and then when he fell I rolled him over and there was his gun, and to keep somebody from getting his gun and shooting me as I went away, I took his gun in my left hand and my gun in my right hand and started away."

There is not another word in the lengthy explanation made of this killing by defendant either as to his intent, his reasons for shooting deceased or any other fact warranting an instruction for manslaughter. In other parts of his testimony he admitted having had, some eight months before, an altercation with deceased, who was his brother, and having then procured a gun with the intent to kill deceased, of which intent, however, he repented (temporarily, at least) before consummating the act; he admitted that he was carrying a pistol on the night that he killed his brother with the object and intention of protecting himself against his brother if he were assaulted; he admitted

the former existence of a deep grudge between them, but avers that he and deceased had made friends.

There is but one other contention made either in the motion for a new trial or in the motion in arrest. This complaint is directed toward the admission and rejection of testimony for and against defendant. We have carefully examined the record and find but four instances where any exceptions were saved to either the admission or rejection of testimony, or to any other action of the court pertaining to the evidence, where exceptions were properly lodged. Carefully examining these we find no shadow of merit in any of them and so drop them now out of this discussion.

The facts of the killing are few, but for some reason the witnesses were remarkably obscure in definiteness and detail and clearness of statement. Whether this obscurity is due to the time and place of the homicide, or whether it is due, as a part of it manifestly is, to the inebriated condition of some of the witnesses, it is difficult to say.

The defendant and the deceased, as has been stated, were brothers. They lived near each other in a little neighborhood called Rockbridge down in Ozark county. The defendant was a blacksmith; the deceased seems to have been a farmer and to have engaged at odd times in logging. Sometime in May, 1912, prior to the killing, which occurred on December 26, 1912, defendant and deceased had an altercation in which deceased severely cut defendant on the hand with a knife. Following this, at an indefinite date, defendant and deceased apparently made friends, though there is testimony in the record as to threats having been made in the interim by each of them against the other. On the night of December 26, a neighbor, Jim Riley, gave a country dance at his residence. Both defendant and deceased attended this dance. There was also present in person that ubiquitous guest, "John Barleycorn," without whom it would seem to be impossi-

ble to properly carry on or "pull off" the *genus* country dance with the requisite pomp and circumstance. After the dance a fist fight arose between one Owen Driscoll, a relative of deceased, and one Aleck Hicks. This fight occurred a short distance from the house, at a place beyond the yard fence and outside the gate, where a fire had been built; about which fire a number of the guests of the evening had gathered to warm themselves, and inferably to hold communion with "John Barleycorn." Prior to the breaking loose of this fight, defendant, deceased and a number of the other guests had started to go home. When the home-going party had reached a point some 150 yards from Riley's house, the noise of the fight reached them and defendant and deceased turned about and came back. When deceased reached the scene of the fight he found his relative Driscoll on the ground with Aleck Hicks on top of him. Deceased ordered Hicks to get off of Driscoll and let him up, which Hicks did and started to go back to the house. The evidence touching the subsequent events is obscure and utterly irreconcilable. It was night; rather dark, though one witness says the moon was shining, and there was some light from the bonfire which had been built near the scene of the homicide; so that the eyewitnesses did not, and we therefore cannot, obtain a very clear or definite idea as to what actually happened. Some of the witnesses say, as the excerpts from their testimony set out above tend to show, that defendant and deceased engaged in a scuffle; other testimony is, and the great weight of the evidence is, that defendant and deceased merely met and were talking a minute or less before defendant shot deceased, and that this talk between them was not sufficiently loud, or violent, or angry, or long continued to attract any one's particular attention prior to the shooting.

After the shooting the knife of deceased was found closed and in his pocket; no pistol or other weapon

was found on him or about him; though there is evidence from two or three witnesses, one of whom was offered by the State, that immediately after the shooting defendant had two pistols.   Defendant himself says that he took one of these pistols from the deceased after the latter had been shot by him.   He gave deceased's pistol, as he avers in his testimony, to the constable or to the sheriff.   Since no denial of this is made by the State, we must assume its correctness, and that in somewise defendant obtained possession of the pistol of deceased.   There is some suggestion in the record, barely sufficient to create a suspicion, because not supported by *any* very definite evidence, that defendant surreptitiously obtained the pistol of deceased from the latter's home shortly before the homicide.

Deceased lived some thirteen days after he was shot, and according to the record, made many statements about the shooting, no two of which agree.   None of these statements was admissible as a dying declaration, though all came into the record without objection, and in fact by agreement of the State and defendant, so that no valid objection can be urged here touching their admission.

The above facts will be sufficient in order to make clear the views which we shall express on the two points we deem involved in this case.

## OPINION.

I.   As foreshadowed above there are but two questions which are sufficiently serious to attract our attention.   The first of these is the question raised by the motion in arrest touching the sufficiency of the information; the second is whether an instruction for manslaughter in the fourth degree should have been given by the learned court *nisi* upon the facts which we have labored to set out fairly.

Touching the first point, that of the sufficiency of the information, there has been in this State much contrariety of opinion. It was held in the case of State *Information.* v. Williams, 184 Mo. 261, and in a line of cases which followed the Williams case, of which the cases of State v. Woodward, 191 Mo. 617, and State v. Birks, 199 Mo. 263, are illustrative and fair examples, that an information or an indictment such as the one now here before us in the instant case, was fatally defective, for that it failed affirmatively to charge that the giving or inflicting of the fatal wound was done feloniously, wilfully, premeditatedly and of defendant's malice aforethought (and in a charge of murder in the first degree, with deliberation).

It is clear to the student of criminal law that there are two lines of cases in this State upon this question. In the case of State v. Arnewine, 126 Mo. 567, which was a conviction for murder in the second degree, an indictment *in pari materia* and in almost the precise words of the one in the instant case, was held sufficient. Likewise in the cases of State v. Rice, 149 Mo. l. c. 466; State v. Privitt, 175 Mo. 207, and State v. Clay, 201 Mo. 679, informations or indictments similar to the one in the instant case, were held sufficient. The three cases last mentioned were appeals from convictions for murder in the first degree, where the jury by their verdict, or the law then in force, affixed the punishment at death. The indictment in the case at bar is a copy in all material respects of the indictment in the case of State v. Clay, supra. In the latter case precisely the same objection was made touching the insufficiency of the indictment as might have been made in this instant case if defendant's counsel had seen fit to urge suggestions upon us here.

Touching the information here we can not do better than to quote the language of the learned jurist who wrote the opinion in the case of State v. Clay,

in which upon a precisely similar state of facts, he said:

"We have carefully analyzed every allegation embraced in the indictment in which the defendant is charged with the highest crime known to our law. We have carefully examined the precedents in cases of this grade and character which have repeatedly met the approval of this court, as well as the precedents by such distinguished authors as Chitty, Wharton and Bishop, and find that the indictment in this case in every essential particular conforms to those precedents. In State v. Kindred, 148 Mo. 270, the indictment was in precisely the same form as in the case at bar; in fact, no one can read the indictment in the case now before us and escape the conclusion that the pleader was following the precedents as laid down in the Kindred case. GANTT, J., in responding to the challenge of appellant to the indictment in that case, said: 'No more certain and specific charge of a deliberate and felonious wounding is to be found in the well-considered precedents in criminal pleading. It fully measures up to the standard approved by Chitty, Wharton and Bishop,' citing in support of this announcement, 3 Chitty's Criminal Law, margin page 752; Wharton's Precedents of Indictments and Pleas, 117a and 117b; State v. Snell, 78 Mo. 240; Com. v. Costley, 118 Mass. 1; State v. Coleman, 5 Porter (Ala.), 32; Kelley's Crim. Law, sec. 474; State v. Thomas, 99 Mo. 235; State v. Herrell, 97 Mo. 105; State v. Steeley, 65 Mo. 218; State v. Green, 111 Mo. 585; 2 Bishop's New Crim. Proc., sec. 541, note 1. In our opinion this indictment clearly embraces every essential allegation necessary to constitute the offense of murder of the first degree and is in such form as has repeatedly met the approval of this court. [State v. Privitt, 175 Mo. 224; State v. Rice, 149 Mo. l. c. 465-66.]"

We are not saying that the great majority of indictments or informations for the crime of murder in

either degree do not go further than the one at bar has gone and charge the felonious giving and inflicting of the mortal wound; but we are saying and the decided cases bear us out, both in theory and in principle, that where an information or an indictment for murder charges that the assault was made feloniously, wilfully, deliberately, premeditatedly and with malice afore-thought; that the using of the pistol was likewise done feloniously, etc., and that the shooting and striking deceased with the leaden bullet in and upon his body or other vital place, was also done feloniously, etc., it is in good sense and reason sufficient for a statement of the facts and circumstances to charge such a killing by shooting as will constitute murder in either degree (deliberation being averred or omitted as the grade sought to be charged may be) and when followed by the proper conclusion and charge of the prosecuting attorney or grand jury upon their respective oaths, sufficiently complies with the constitutional guaranty that the defendant is entitled "to demand the nature and cause of the accusation" against him. [Section 22, article 2, Constitution of Missouri.] For, if it be averred in an information that deceased was feloniously, etc., shot and struck or hit in the head or body with a leaden ball fired from a gun or pistol, and thereafter and immediately following such averment it be further charged substantially thus: "Then and there giving to (deceased) . . . with the pistol (or gun) and the leaden ball aforesaid . . . mortal wounds," it is extremely difficult for the finite mind to avoid the irresistible conclusion, that the infliction of the lethal wound was in some intimate constitutional way, connected with the shooting and striking of deceased by the accused. Having in this behalf naught to avoid except the constitutional Charybdis, supra, we deem it sufficient in grammar and language, and diction, *ergo,* in law. We hold therefore that the infor-

mation in this case is sufficient, and disallow this point to defendant.

II.  The motion for a new trial specifically urges error upon the ground that the learned court *nisi* failed to instruct on manslaughter in the fourth degree.  Defendant also, at the time the instructions given by the court were read to the jury, objected and saved his exceptions for that said instructions "did not declare all the law necessary to a proper de-

Instruction: Manslaughter in Fourth Degree.

termination of the case on the issues raised by the evidence."  While no specific objection was made at the time on account of the failure of the court to instruct on manslaughter in the fourth degree, yet we take it that under the rule announced in the case of State v. Conway, 241 Mo. 271, and since uniformly followed by this court, we must, the statute considered, regard this point properly saved.  Therefore, if we find that the testimony showed a state of facts which under the law made it obligatory to instruct on manslaughter in the fourth degree in order that defendant might have the benefit of all the issues fairly raised by the evidence, and of a fair and impartial trial, this case must be reversed.  If we do not so find upon the facts when fairly and frankly considered, we must affirm it.

In order to carefully weigh and determine whether the facts as shown by the testimony of the witnesses, which we have set out in our statement of the case, constituted such an assault or indignity as would work or did so work upon defendant here as to lower his act from that of murder in the second degree to that of manslaughter, we may look to our own holdings and definitions, as well as the textbooks treating of manslaughter and discussing the adequacy of the provocation and the conditions necessary to be present in order to differentiate it from murder in the second degree.

This distinction has been pointed out by this court in the case of State v. Curtis, 70 Mo. l. c. 600, and as we may not assume to add to the clarity of the definitions there contained, we quote:

"Where there is a willful killing with malice aforethought, that is, with malice and premeditation, but not with deliberation, or in a cool state of the blood, the offense is murder in the second degree.   Nor can any homicide be murder in the second degree unless the act causing death was committed with malice aforethought, that is with malice and premeditation.  Where there is a willful killing without deliberation and not with malice aforethought, the offense is manslaughter; but whether manslaughter in the second or fourth degree, will depend upon whether the facts bring the killing within the 12th or the 18th sections of the chapter on homicide.   [State v. Edwards, 70 Mo. 480.]"

On the question of the sufficiency, or adequacy of the provocation, a well-known textwriter in an able review of this identical question, says:

"A provocation is deemed to be adequate, so as to reduce the offense from murder to manslaughter, whenever it is calculated to excite the passion beyond control.  It must be of such a character as would, in the mind of an average just and reasonable man, stir resentment likely to cause violence endangering life, or as would naturally tend to disturb and obscure the reason and lead to action from passion rather than judgment, or to create anger, rage, sudden resentment or terror rendering the mind incapable of reflection." [Wharton on Homicide (3 Ed.), sec. 172.]

Our own court, dealing with the matter of sufficiency of provocation somewhat specifically rather than generally, said in the case of State v. Edwards, 70 Mo. l. c. 483, that:

"Any assault made with violence, or circumstances of indignity upon a man's person, as by pulling him by the nose, if it be resented immediately by

the death of the aggressor, and it appears that the party acted in the heat of blood upon that provocation, will reduce the killing to manslaughter. The intentional killing of another without malice on sudden quarrel or in heat of passion was manslaughter. [1 East's Pleas of the Crown, 233-234-235; 4 Bl. Com. 191; 2 Bishop's Crim. Law, 676; State v. Starr, 38 Mo. 270; State v. Holme, 54 Mo. 165.]''

When we consider the facts in proof that defendant in company with deceased, just prior to the sudden scuffle (as the witnesses put it, and the assault with both a knife and a pistol as the defendant testifies) which ended in the shooting of deceased, was on his way home; that so far as appears amity and peace prevailed between them; that upon the up-coming of a sudden affray between the relative of deceased and another, both defendant and deceased turned back and came hurriedly to the scene of this fight; that deceased took part in the difficulty at once by compelling Hicks to let deceased's kinsman, Driscoll, up, and that *instanter* trouble arose between deceased and defendant, in the course of which deceased as aggressor took hold of defendant, shook him, cursing all the while, and, to quote defendant, began cutting his clothing and hand with a knife, we think the jury should have been instructed on manslaughter in the fourth degree. [State v. Banks, 73 Mo. 592; State v. Gee, 85 Mo. 647; State v. Partlow, 90 Mo. 608; State v. Wensell, 98 Mo. 137; State v. Hermann, 117 Mo. 629; State v. Brown, 188 Mo. 451; State v. Gordon, 191 Mo. 114; State v. Weakley, 178 Mo. 413; State v. Richardson, 194 Mo. 326; State v. Goldsby, 215 Mo. 48; State v. Wilson, 242 Mo. 481.] Many of these cases are, upon the facts, substantially upon all-fours with the case at bar, and in all of them the necessity of instructing for manslaughter in the fourth degree is either ruled upon directly, or instructions for that grade of homicide held proper upon the facts in proof.

In the case of State v. Weakley, supra, at page 423, this court in discussing some of the legal differences between murder in the fourth degree, as well as some of the provocations which are deemed sufficient to reduce homicide from murder to manslaughter, said:.

"It is clear from the testimony that the killing was intentional. The defendant was therefore guilty, under the evidence, of murder in the second degree, or of manslaughter in the fourth degree, unless the homicide was justifiable. It has been said that under our statute manslaughter in the fourth degree includes every homicide not justifiable or excusable which was manslaughter at common law, and which is not excusable or justifiable, or is not declared by statute to be manslaughter in some other degree. [State v. Edwards, 70 Mo. 480; Sec. 3477, R. S. 1889; State v. Watson, 95 Mo. 411.]   Therefore, 'if the party act upon sudden passion, engendered by reasonable provocation, the existence of malice will be negatived and the killing, though intentional, will be manslaughter in the fourth degree.'  [State v. Curtis, 70 Mo. 594.]  But in order to reduce the offense from murder to manslaughter, the killing must be done in a heat of passion on a reasonable provocation, without malice and without premeditation, and under circumstances that will not be justifiable or excusable homicide.   And the passion which will reduce homicide to the grade of manslaughter is an excited state of the mind produced by some lawful provocation, such as a blow, or an assault of any kind upon the person. [State v. Ellis, 74 Mo. 207.]

"It was the duty of the court to instruct the jury upon all questions of law arising in the case which were necessary for their information in giving their verdict (Sec. 2627, R. S. 1899), and as there was evidence tending to show that the deceased assaulted the defendant and struck him over the head with a revolver just before defendant shot him, which if true

was certainly reasonable provocation, as it must have tended to arouse that heat of passion which negatives malice, and whether it did so or not should have been submitted to the jury, and the court erred in failing to so do, when its attention was called to the fact that it had failed to instruct the jury upon all the law of the case under the evidence.''

For the failure of the court to so instruct the jury upon the facts here, this case must be reversed and remanded, to be retried in accordance with these views.

It is so ordered. *Walker, P. J.,* and *Brown, J.,* concur.