THE STATE v. ELMER JENKINS, Appellant.—37 S. W. (2d) 433.

Division Two, March 25, 1931.

*Stratton Shartel,* Attorney-General, and *Edward G. Robison,* Assistant Attorney-General, for respondent.

328

HENWOOD, J.—By an information filed in the Circuit Court of Audrain County, the defendant, a Negro, was charged with murder in the first degree, the victim of the alleged murder being James Glover, a Negro. The jury found the defendant guilty of murder in the second degree and assessed his punishment at imprisonment in the penitentiary for thirty-five years. He was sentenced accordingly, and appealed.

It is undisputed that the defendant shot Glover in the abdomen and right groin, with a "single barrel, number twelve," shotgun, about 10:30 o'clock Sunday night, September 1, 1929; and that Glover died, two or three hours later, as the result of gunshot wounds so received; and that the shooting occurred on the west side of Walnut Street, between Railroad Street and Lafayette Street, in the city of Mexico, in Audrain County, in front of a two-story, double-store building, in which Tom Ed Harrison, a Negro, operated a grocery store and a restaurant on the first floor, and in which Harrison and Glover occupied living rooms on the second floor. There is no conflict in the evidence except as to the circumstances under which the shot was fired.

According to the evidence adduced by the State, about 10:15 o'clock on the night in question, when several Negro men and women were on the sidewalk in front of the Harrison building, Glover entered the passageway at the north side of the building. Shortly thereafter, the defendant joined the crowd, and, while he was engaged in conversation with Eunice Hord, a Negro woman, at or near the entrance to the passageway mentioned, Glover appeared and interrupted the conversation. Following an altercation between Glover and the defendant, the defendant walked rapidly backwards into Walnut Street, pursued by Glover. Glover was cursing and threatening the defendant. The defendant picked up some rocks as he backed into the middle of the street, then dropped the rocks, and ran south, on Walnut Street, to Lafayette Street, and east on Lafayette Street. Glover stood in the street about three minutes, then walked back to the sidewalk in front of the Harrison building, and stood there, leaning against the building, between the entrance to the restaurant and the stairway leading to the second floor. Within five or ten minutes, the defendant returned to the scene with a shotgun, and, advancing from the middle of the street toward Glover, shouted, to a bystander who was between him and Glover: "Look out," or "Get out of the way." Harrison, then in his room on the second floor of the building, heard this shout, and, seeing the defendant in the street with a gun, shouted to the defendant, from a window: "Put that gun down; don't you shoot." The defendant continued to advance toward Glover, and with the gun pointed at him, said to him: "G— d— you, I'm going to shoot you." Glover standing "perfectly still," replied: "Shoot, you son-of-a-b—, shoot." At that instant, the defendant fired, and Glover ran forward, toward the defendant, in a falling position, then turned around and dragged himself up the stairway, to the door of his room. When the defendant fired the shot, he was from ten to twenty-five feet away from Glover. The physician who examined Glover shortly after the shooting testified that Glover was "drunk." The officers were unable to find the defendant that night, after the shooting, but he "voluntarily gave himself up" the next morning.

The defendant testified: He was twenty-four years of age, and had been working for the A. P. Green Fire Brick Company, in Mexico, for eight or nine years. He went to Harrison's restaurant, in company with "another boy," about 10:15 or 10:20 o'clock on the night in question. He called Eunice Hord to the passageway at the north side of the Harrison building, and, while he was talking to her, Glover "come up," and put his arm around Eunice, and said to her: "How's my little wife?" He (the defendant) said to Glover: "I wouldn't do that; I always treated you like a man; I

don't see why you want to try to rough over me all the time.''
Thereupon, Glover began ''cussing'' him; and called him ''a black
son-of-a-b—;'' and Glover told him that he didn't give a d— about
him, and that he would cut his (the defendant's) throat. Then, he
(the defendant) ran around in front of the restaurant and Glover
followed him. He picked up some rocks, and Glover told him, if
he threw the rocks, he (the defendant) ''was born to die.'' He
dropped the rocks, ran to his home, got his gun, and, when he came
back, Glover said: ''Go ahead and shoot, you little son-of-a-b—,
because, if you don't shoot me, I'm going to get you.'' As Glover
said this, Glover ''started toward'' him, and he ''just throwed the
gun up and shot.'' He thought Glover had been ''drinking.'' He
did not go home and get his gun with the intention of shooting
Glover. He came back, with the gun, to take Eunice to her home. He
''didn't know whether he (Glover) had anything or not,'' and he got
the gun because he was ''scared.'' He had been keeping company with
Eunice for two or three years. During the previous fall, when he
and Eunice had a ''little argument'' in front of a pool hall, Glover
''come up'' with a knife and ''run'' him away. And, sometime
during the previous winter, Glover came to Eunice's home, and
cursed and abused him, and ''started toward'' him with a knife,
and he (the defendant) ran ''out the back door.'' On cross-exam-
ination, he said that he got the gun, on the night of the shooting,
''for protection;'' that he did not intend to shoot Glover ''unless
he (Glover) tried to bother'' him; that he did not ''level the gun''
at Glover, and ''didn't know whether he shot him until the next
day;'' that, when he went to his home to get the gun, and when
he came back to the restaurant with the gun, his mind was in a
''cool state;'' and that, after the shooting, he threw the gun away,
''down there by the creek,'' near the restaurant, and ''run out to-
wards Auxvasse.'' On redirect examination, he said he was ''mad
and scared both'' at the time of his ''first encounter'' with Glover
on the night of the shooting, when Glover ''chased'' him into the
street.

Eunice Hord testified, on behalf of the defendant: She had been
keeping company with the defendant for two or three years prior
to the night of the shooting. She had not kept company with
Glover for about seven years. She ''had a little boy by him,''
but had never been married to him. While she was talking to
the defendant on the night of the shooting, Glover ''come up''
and said to her: ''How's the boy?'' She did not hear him say
''anything else,'' nor ''hear any argument or fussing'' between
Glover and the defendant that night. When Glover interrupted
the conversation between her and the defendant, she went into the
restaurant. She did not see Glover or the defendant again until

after the shooting. During the previous winter, trouble occurred between Glover and the defendant on several occasions. In the previous December or January, Glover came to her house and "run" the defendant "away with a knife."

The witness Everett Price corroborated the defendant's testimony as to what occurred at the time of the defendant's first encounter with Glover, on the night of the shooting; and Price and the witness Jim Breckenridge corroborated the defendant's testimony as to what occurred at the time of the shooting.

Price testified: When the defendant was talking to Eunice Hord, Glover "walked up" and said to the defendant: "I have been taking enough off of you, for a long while." The defendant "reached down to get him some rocks," and Glover said: "If you throw one of them rocks, you are born to die." Glover "advanced" on the defendant, with "his right hand in his pocket," and the defendant ran. About three minutes later, the defendant came back with the shotgun, and Glover said to him: "Shoot, you son-of-a-b—; if you don't, I will get you." Then, the defendant "shot," and Glover "fell." On cross-examination, he said he had never been convicted of a criminal offense.

Breckenridge testified: When the defendant came up in front of the restaurant with the shotgun, Glover said to him: "Shoot, you son-of-a-b—, or I'll get you." Glover "had his hand in his pocket, and started towards him," (the defendant). The defendant "backed up." Glover "seemed to keep walking about another step, and Jenks (the defendant) fired." On cross-examination, he admitted that, between June, 1915, and April, 1918, he was convicted of assault four times, and of gambling twice.

Breckenridge and another witness, Howard Huffman, testified that, during the previous winter, Glover and the defendant had an encounter in which Glover cursed the defendant, and made "threats" against him, and chased him away from a pool hall.

Several witnesses testified to the defendant's good reputation for peacefulness and law-abiding citizenship. One of these witnesses also testified that Glover had the reputation of being "peaceable if he wasn't drinking; but, if he was (drinking), he was overbearing like."

In rebuttal, the State showed, by the records of a justice of peace of Salt River Township. in Audrain County, that the witness Everett Price was convicted of gambling in March, 1927, and of the unlawful possession of intoxicating liquor in April, 1928.

No brief has been filed on behalf of the defendant. In his motion for a new trial, he has preserved for our review the following assignments of error:

That the evidence is not sufficient to support the verdict; that the trial court erred in excluding evidence of his good reputation for truth and veracity, and in giving the State's Instruction No. 2, on murder in the first degree, and in refusing the defendant's instruction No. 8, on the rule of reasonable doubt, and in refusing the defendant's Instruction No. 10, on Glover's turbulent and dangerous disposition when under the influence of liquor; "that error was committed by the jury in arriving at a verdict, in that said verdict was a quotient. verdict;" and that the punishment assessed against him is excessive.

I. Manifestly, there is no merit in the defendant's challenge of the sufficiency of the evidence. It is undisputed that, after an encounter with Glover on the night in question, the defendant went to his home, and five or ten minutes later, returned to the scene of said encounter with a loaded shotgun. And, according to the State's evidence, he immediately advanced toward Glover, shouted to a bystander to "look out," or to "get out of the way," pointed the gun at Glover, and fired the fatal shot while Glover was standing still, at a distance of ten to twenty-five feet away from him, and making no attemt to harm him in any way. Three unimpeached witnesses for the State testified to this effect. With this evidence before them, the jury were fully warranted in finding the defendant guilty of murder in the second degree; indeed, they would have been justified in finding him guilty of murder in the first degree. [State v. Lloyd (Mo. Sup.), 263 S. W. 212.]

II. The trial court properly excluded evidence of the defendant's good reputation for truth and veracity, because his reputation for truthfulness was not attacked by the State. [State v. Marshall, 317 Mo. 413, 297 S. W. 63.]

III. From what we have already said concerning the State's evidence, it follows that the State's Instruction No. 2, on murder in the first degree, was properly given. The defendant, however, is not in a position to complain of the giving of this instruction, because the jury found him guilty of murder in the second degree, a lesser offense. [State v. Lloyd, supra.]

IV. The State's Instruction No. 8 embodied the true doctrine as to the rule of reasonable doubt. Having given such instruction, the trial court did not commit error in refusing to give the defendant's Instruction No. 8, which covered the same subject-matter. [State v. Howard (Mo. Sup.), 23 S. W. (2d) 16.]

V. The defendant's refused Instruction No. 10 reads as follows: "The court instructs the jury that, if you find and believe from the evidence that the deceased was of a rash, turbulent, quarrelsome and dangerous disposition when drinking and under the influence of liquor, and that at the time of the difficulty the deceased had been drinking and under the influence of liquor, and at the time of the difficulty the deceased had been drinking and was to any extent under the influence of liquor, or appeared to be so, and that defendant had knowledge of such disposition at the time of the alleged killing, then it is a circumstance for the consideration of the jury in considering the reasonable cause for defendant's apprehension of great personal *injury* to himself."

There is evidence that Glover was "drunk" at the time of the shooting, and that the defendant thought Glover had been "drinking," and that, when "drinking," Glover was "overbearing like." But, there is no evidence that Glover was of a turbulent and dangerous disposition when under the influence of liquor, or that the defendant knew, at the time of the shooting, that Glover was of such a disposition when under the influence of liquor. Therefore, it is apparent at once that the instruction above quoted was properly refused.

VI. In support of the charge that the jury determined the amount of his punishment in an improper manner, the defendant attached to his motion for a new trial the following exhibit and affidavit:

"EXHIBIT A

"Exhibit A is a yellow sheet of ruled paper such as is furnished to attorneys for use in making notes, also to juries for their use while deliberating on verdicts, and contains the following figures, arranged on the sheet about as follows, the figures being made with lead pencil:

17
90
———
· 15.30
———

250 ——————————————————200———
· 15.30
———
15.30
234.70
———
· 250.00
50
———
200———

12)424(35*
—36—
———
: 64

"State of Missouri } ss.
County of Audrain }

"Joseph M. Bone, Jr., attorney of record (for the defendant) in the above and foregoing cause, on his oath states, that the paper hereto attached marked 'Exhibit A,' was called to his attention immediately in the jury room upon the table in said room, and being the tabulation after the above cause was tried, as being the tabulation showing how the verdict in the above cause was reached by said jury, that said tabulation shows that the number of each years of punishment recommended by each juror was added together and then divided by the total number of jurors giving the result of 35, being the verdict returned in this cause. That the affiant secured this paper marked 'Exhibit A' from the jury room, and that said paper was the only paper lying upon said jury table.

"JOSEPH M. BONE, JR., Affiant.

"Subscribed and sworn to before me this 5 day of Oct., 1929.

"My commission expires the 26 day of Aug., 1929.

"(SEAL)

"ALONZO C. WHITSON, Notary Public."

For the sake of the argument, it may be assumed that the figures on the sheet of paper found in the jury room were made by the jury. But, it will be noted that, while these figures show 424 divided by 12, with a result or quotient of 35, they do not show "that the number of years of punishment recommended by each juror was added together, and then divided by the total number of

jurors, giving the result of 35.'' Nor is it otherwise shown that the jury agreed to, and carried out, that method of determining the amount of the defendant's punishment. In the absence of such proof, the charge that the jury returned ''a quotient verdict'' is unavailing. [State v. Richmond, 321 Mo. 662, 12 S. W. (2d) 34.]

VII. The defendant's final complaint in his motion for a new trial, of excessive punishment, is also without avail. The fixing of punishment for crime is a legislative and not a judicial function, and, when, as in this instance, the punishment assessed is within the range prescribed by statute, we cannot adjudge it to be excessive. [State v. Wheeler, 318 Mo. 1173, 2 S. W. (2d) 777.]

We find no error, either in the record proper or in any of the trial proceedings complained of. The judgment is accordingly affirmed. All concur.