STATE v. ROBERT THURMAN PORTER, Appellant.—No. 40465.—208 S. W. (2d) 240.

Division One, February 9, 1948.

*Tedrick & Tedrick* for appellant.

*J. E. Taylor*, Attorney General, and *David Donnelly*, Assistant Attorney General, for respondent.

[240] BRADLEY, C.—November 8, 1946, in Butler County, defendant shot and killed Russell Leslie, and was charged with murder in the first degree. The venue was changed to Ripley County where he was, on April 14, 1947, convicted of murder in the second degree and his punishment fixed by the jury at 10 years imprisonment in

the penitentiary. Motion for a new trial was filed and overruled and defendant appealed.

Defendant is a tenant farmer and at the time of the homicide resided on a farm in New Madrid County, a short distance east of Malden, and according to his neighbors, he bore a good reputation. At the time of the trial defendant was 49 years old. Deceased was 40 when killed and at that time lived with his father and mother in the country, some 2 miles south of Bloomfield in Stoddard County. Defendant was married; [241] had a wife, 2 daughters and a son. One of the daughters was married; the other daughter was 15 and the son 12. Both defendant and deceased had been patients at the tuberculosis sanitarium at Mt. Vernon, Missouri, and deceased was a barber at the sanitarium for a time. Defendant was in the sanitarium at Mt. Vernon some 21 months; he was stricken with tuberculosis in 1938, and prior to going to Mt. Vernon was at the Webb City sanitarium. He moved his family to Mt. Vernon and the older daughter married there. Defendant's wife worked for a time in the sanitarium at Mt. Vernon.

While at Mt. Vernon deceased and defendant's wife became acquainted; defendant endeavored to terminate their association. September 6, 1946, he and his family moved back to the farm in New Madrid County. About two weeks thereafter, defendant and deceased met in Malden and had a conversation. Of this conversation defendant testified: He "walked around in front of me and wanted to shake hands with me and he was pretty drunk at the time. Q. All right, what was said there and what was done? A. I said I didn't want to shake hands with him. I said, 'You done enough for me, Russell, and I don't want to have any more to do with you and I want you to go on and leave me alone', and he said, 'why, you ought to be proud of me', that is what he first said. He said, 'you ought to be proud I left out there (Mt. Vernon) after you talked to me and not been bothering your wife any more', and I said, 'I am not proud of you about anything', and then he said, 'well you ought to be, and you ought not to blame me because the whole fault was hers.' He said, 'I would be on the streets there in Mt. Vernon a drinking, and she would come up to me and go to talking and wouldn't leave me alone.' " Next day after the Malden conversation defendant intercepted a letter from deceased to Mrs. Porter and read it; sealed it again and delivered it to her. Mrs. Porter ascertained that defendant had read the letter and then she tore it into small pieces and put the pieces in her pocket. The letter, according to defendant, advised that he (deceased) was working in his cousin's barber shop in Malden; was going to Michigan soon, and asked Mrs. Porter to come to Malden Saturday night. And a short time before the homicide deceased sent a telegram from Dexter, Missouri, to Mrs. Porter at Mt. Vernon.

The next day after the letter incident Mrs. Porter left the home on the farm and returned to Mt. Vernon. · Defendant sought to arrange to take his son and overtake his wife at Jonesboro, Arkansas, hoping the son who was much attached to his mother, and who had been crying because she was gone, would be helpful in persuading her to return. But because of tire trouble on his truck, he did not take the son but went alone on the bus and overtook his wife at Jonesboro; endeavored to persuade her to return home, but she refused to do so. He later made a trip to Mt. Vernon to get her to return home, but she refused to return.

Thereafter defendant conceived the idea that if deceased would tell Mrs. Porter the fault was all hers; that she was to blame, etc., that she would get mad at deceased and would return to defendant and the children. With such idea in mind defendant endeavored to get deceased to state in writing that Mrs. Porter was all to blame, and deceased promised to do so. Defendant testified: ''He told me he would (make the written statement) and he said, 'I will do more than that; I will write her and tell her what kind of a fool she is and tell her I am through with her and that the best thing she can do is to come on back and help you raise the children.' '' Deceased never did get around to making the written statement or writing Mrs. Porter the letter he promised. Failing to get a written statement defendant asked deceased to go with him to Mt. Vernon and tell Mrs. Porter he was through with her; that their association was all her fault and that she ought to return home and help raise the children, and deceased agreed to do that. So on November 8, 1946, defendant, in his truck, picked up deceased near the home of deceased and they started, about 4 P. M., to Mt. Vernon. When about 5 miles west of Poplar Bluff on highway 60, defendant says that deceased began to talk like he did not want to go; said his mother was sick; that [242] defendant could not get him back by daylight; that deceased grabbed defendant; said, ''Me and this' truck (which defendant was driving) is not going any farther''; that deceased grabbed for the keys but did not get them. ''I beat him to the keys.'' The highway at this point runs east and west. Defendant says that he stopped the truck on the right hand (north) side of the highway; that deceased got out on the north side of the truck and that he got out on the south side; that deceased ''came around the truck after me''; that they got into a scuffle (deceased trying by force to get the keys) and scuffled south across the road and into the woods and bushes on the south side of the road. When some 40 or 50 feet south of the road, according to defendant's evidence, deceased picked up a rock. Concerning what then occurred defendant testified:

''When we got out into the woods a little piece, I was completely out of breath and I am very short-breath anyhow, and he reached down and picked up a rock (they were about 10 feet apart then)

and said, 'Robert, I intend to have them car keys regardless of what it takes.' He started toward me and I backed a few steps and he kept coming after me and I shot him. I shot him twice. The first time I hit him some place in the right chest and the second shot some place in the head. When I shot him through the chest the first time he kept coming toward me and still had the rock in his hand.''

Defendant further testified: ''Q. Now, Robert, at the time you shot this man, tell the jury whether or not you believed that your life was in danger or that he was about to do you some great bodily harm. A. I was just completely give out and out of breath. Q. Considering your condition and considering what threats he made and what he had in his hand and the facts that you detailed, coming toward you, did you believe your life was in danger or he was about to inflict some great bodily harm to you? A. When he picked that rock up and started toward me and said what he did, I thought he meant to do it. That is what I thought. Q. And that is why you shot him? A. Yes, sir. Q. If he hadn't done that would you have shot him? A. No, I wouldn't.''

After the homicide defendant returned to his home east of Malden and the next day (Saturday) made arrangements for his son and daughter, and then on Sunday, went to Malden and saw an attorney. The attorney referred him to Mr. L. E. Tedrick at Poplar Bluff, and defendant, on same day, went to Poplar Bluff, contacted Mr. Tedrick, and Mr. Tedrick turned him over to the officers. On same day, defendant, with the officers, went out to locate the body of deceased, but the body was not found until the next day.

Error is assigned (1) on the admission of evidence; (2) on the refusal of requested instructions; (3) on cross-examination of defendant; (4) on argument of counsel for the State; and (5) on the failure to instruct on manslaughter.

Appellant complains of the admission in evidence of the State's exhibit No. 4, a photograph of deceased as he lay in the bushes and before being disturbed or moved after the body was discovered. Defendant says that the corpus delicti was admitted and that there was no question of the identity of deceased and that the admission of the exhibit could have served no purpose except to prejudice the jury.

The State makes the point that defendant did not assign error in his motion for a new trial on the admission of exhibit No. 4, and that is true. Error is assigned in the motion on the admission of exhibit No. 3. Exhibits No. 4 and 5 appear in the transcript, but exhibit No. 3 does not. The record shows that the trial court sustained defendant's objection to exhibit No. 3. In view of another trial, as appears infra, we should consider the competency of exhibit No. 4. The trial court admitted exhibit No. 4 on the theory that it shows the location of the deceased and the surrounding area, bushes, etc.

We think the exhibit was admissible. State v. McGee, 336 Mo. 1082, 83 S. W. (2d) 98, 1. c. 107; State v. McDaniel, 336 Mo. 656, 80 S. W. (2d) 185, 1. c. 193.

The court gave an instruction on self-defense, but defendant deemed the instruction not sufficient and offered an instruction [243] on self-defense which the court refused. It will not be necessary to set out these instructions. It is sufficient to say that the instruction on self-defense given by the court was substantially in the same form as the instruction on self-defense approved in State v. Jones, 309 Mo. 50, 273 S. W. 730; State v. Sebastian, 215 Mo. 58, 114 S. W. 522.

Complaint is made on the cross-examination of defendant about what he told the officers while under arrest and as to where on his person he had the pistol with which he shot deceased, and as to how long he had had this gun. It is contended that none of these matters was gone into on direct examination and that such cross-examination was beyond the scope of the direct examination and improper. On cross-examination defendant was asked if he told the officers about the scuffle off the road. Objection was made on the ground that on direct examination defendant was not asked what he told the officers. The court in overruling the objection remarked that he thought counsel for defendant had asked defendant whether he told the officers how it happened, and it does appear in the direct examination that defendant was asked if he told the officers about shooting the deceased. On cross-examination defendant was asked where he had the pistol with which he shot deceased and answered, without objection, that he had it in his right hip pocket. Then he was asked how long he "had it there." Thereupon objection was made that such inquiry was beyond the scope of the direct examination. There was no answer as to how long he had had the gun in his right hip pocket. After the objection defendant was asked how long he had had the gun and without objection answered, "something like 2 weeks" before the homicide. Then he was asked if he had bought the gun. Objection was made to this question and the question was withdrawn. We do not think defendant was in anywise prejudiced by the cross-examination. State v. Tull, 333 Mo. 152, 62 S. W. (2d) 389, 1. c. 392; State v. Revard, 341 Mo. 170, 106 S. W. (2d) 906, 1. c. 910.

In argument to the jury the prosecuting attorney said defendant "shot deceased the second time while he (deceased) was lying there on the ground." The sheriff testified that defendant told him that after the first shot deceased fell to the ground and groaned an that he, defendant, didn't want to leave him in that kind of shape "and he finished him up." Manifestly, there is no merit to this assignment.

The most serious question is the failure of the court to instruct on manslaughter. When the court failed to instruct on man-

slaughter defendant offered an instruction on manslaughter and it was refused. Defendant insists that the facts required an instruction on manslaughter. The character of manslaughter here, if such is involved, is the killing of another intentionally but in a sudden heat of passion due to adequate provocation and without malice. State v. Burrell, 298 Mo. 672, 252 S. W. 709, l. c. 711 (2). The term provocation is defined in Wharton On Homicide (3rd Ed.), 172, and the definition is quoted with approval in State v. Conley, 255 Mo. 185, l. c. 198, 164 S. W. 193. The definition follows: "A provocation is deemed to be adequate, so as to reduce the offense from murder to manslaughter whenever it is calculated to excite the passion beyond control. It must be of such a character as would, in the mind of an average just and reasonable man, stir resentment likely to cause violence endangering life, or as would naturally tend to disturb and obscure the reason and lead to action from passion rather than judgment, or to create anger, rage, sudden resentment or terror rendering the mind incapable of reflection."

As appears, defendant said that he shot deceased in self-defense. There is a line of cases in this state holding that where one charged with murder claims that he shot in self-defense that such homicide could not be the result of a sudden passion arising from just provocation, but that line of cases is no longer followed. See State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) 556, l. c. 561. It is pointed out in the Creighton case [52 S. W. (2d) l. c. 562] that if there is substantial evidence of lawful provocation the defendant is entitled to [244] an instruction on manslaughter even though he claims self-defense.

The subject of a manslaughter instruction is considered at length in the Creighton case, and it is pointed out that it is the general rule that where there has been an assault *and* battery an instruction on manslaughter should be given. See also State v. Littlejohn, 356 Mo. 1052, 204 S. W. (2d) 750. In the Creighton case it appears that the deceased walked up to the defendant and brushed against him and asked him if he was looking for trouble; that defendant said, "Beg your pardon"; that deceased then said. "What are you doing with my girl?" to which the defendant answered, "I didn't know it was your girl." That deceased then applied some epithet (not set out in the opinion); that deceased then grabbed defendant by the lapel of the coat and turned him around and slapped him, and then stepped back and "let his hand back like that" (illustrating). The defendant said that he made no hostile move toward deceased until deceased had stepped back and reached for his hip pocket; that when defendant shot deceased the first time, the deceased just stood still as a distance of 2 or 3 feet, and then advanced on defendant and defendant shot the second time. It was held that a manslaughter instruction should have been given.

In the Littlejohn case deceased owed defendant a dollar; on the night of the homicide deceased. and defendant, by chance, occupied the same cab and while in the cab entered into a discussion concerning the loan. When the cab stopped where deceased was to alight he told the cab driver that he didn't have any money but said that he would go back and get it. Deceased then went into a gangway leading to where he lived. Shortly thereafter the defendant got out of the cab and went into the gangway to see what deceased "was doing out there so long." Deceased asked the defendant what he came back there for and defendant said that he came back because he thought deceased might pay him, and defendant testified that the deceased then rushed on him and hit him. Defendant said that he then turned around and started back to the cab and that when he turned around the deceased knocked him down; that when he got up he saw the deceased pull something out of his pocket; that it looked like a knife, and rushed at him and that he, defendant, ran; pulled his pistol and shot back and killed deceased. It was held that a manslaughter instruction should have been given.

It will be noted in the present case that after defendant and deceased got out of the truck deceased came around "after him" (defendant). The inference is clear, according to defendant's evidence, that deceased came around the truck and by force undertook to take the keys and from then on, they were in a physical contest until just before the shooting. ·

In view of the relation between defendant and deceased and under the circumstances, the effort on the part of deceased to take the keys from defendant by physical force was, in effect, an assault and battery. 4 Amer. Jur. (Assault and Battery), Sec. 2, p. 125. The text mentioned defines a battery as "the unlawful touching or striking of the person of another by the aggressor himself . . . done with the intention of bringing about a harmful or offensive contact or apprehension thereof which is not legally consented to by the other and not otherwise privileged." The circumstances, the announced intention of deceased to go no farther, and his determined effort to take the keys from defendant by force (the assault) were sufficient, we think, to make the question of provocation one for the jury.

As stated, the subject of manslaughter is discussed at length in the Creighton case and the subject is discussed in the Littlejohn case. It would serve no useful purpose to repeat these discussions. We think that under the facts of the present case the defendant was entitled to an instruction on manslaughter. The judgment should be reversed and the cause remanded. It is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.