248 S.W.2d 847 (1952)
STATE
v.
MORRIS.
No. 42672.
Supreme Court of Missouri, Division No. 2.
May 12, 1952.
*848 S. W. James, Jr., Jefferson City, for appellant.
J. E. Taylor, Atty. Gen., A. Bertram Elam, Asst. Atty. Gen., for respondent.
ELLISON, Judge.
The appellant was convicted in the circuit court of Jackson County of murder in the second degree and his punishment assessed by a jury at life imprisonment in the state penitentiary under sections 559.020, 559.030, RSMo 1949, V.A.M.S., for shooting and killing with a pistol one John Mack Nolen. His counsel assign here as error: (1) the admission at the trial of a photograph of the corpse of the victim, on the theory that it was gruesome and tended to inflame and prejudice the jury against the appellant, without having any tendency to prove any material fact in the case; (2) the giving of two alleged faulty instructions on appellant's defense of insanity; (3) failure to instruct the jury as to the form of their verdict in the event they found the appellant to be insane at the time of the homicide; (4) improper argument by State's counsel referring to the appellant's failure to testify at his trial, and other improper argument which was inflammatory and prejudicial; (5) and that the only evidence on appellant's sanity or insanity at the time of the homicide preponderatingly showed him to be insane.
The outline facts were that about midnight on October 15, 1949, the appellant and his brother Aaron Morris were in a crap game at 2322 Michigan Street in Kansas City. The "house man" was Haywood Nelson. As we understand all the parties assembled were Negroes. The appellant, who *849 did not testify at the trial, gave a written statement to the police the day after the homicide, which the State introduced in evidence. In it he said he and Nolen got in an argument over a $2 bet in a crap game. Nolen claimed it was a $4 bet and that he had won it from appellant. Appellant denied that, asserting his $2 bet had not been with Nolen, but with a third man. Nolen threatened to collect the $4 later and left the house. Appellant and his brother Aaron quit the game 20 or 30 minutes thereafter. Nolen had waited outside across the street. He attempted to collect the money by force, reached for his back pocket and approached appellant. The latter drew his own revolver and gave warning, but Nolen continued toward him, whereupon appellant fired once, the bullet piercing Nolen's chest causing instant death. He fell on the ground by the sidewalk. The testimony of appellant's brother Aaron corroborated his confession and elaborated on it some.
With reference to appellant's first assignment that the trial court erred in admitting in evidence a photograph of the corpse of the deceased Nolen. After the prosecuting attorney had made his opening statement of facts counsel for the appellant reserved his opening statement [and, in fact, never did make a statement]. Thereupon the prosecuting attorney introduced the appellant's confession over his objection and three photographs of the corpse of the deceased, marked Exhibits 2, 3, and 4. The first two of these were taken at the scene of the homicide a short time after it occurred, showing the deceased lying on the ground by the sidewalk. No objection was made to them. But when the third photograph, Exhibit 4, was offered appellant's counsel made the objection that it was gruesome, tended to inflame the jury and did not tend to prove or disprove any material fact in the case. That photograph showed the corpse lying in an undertaking establishment stripped to the waist and disclosed a bullet wound in the chest.
Appellant's counsel cites in support of his contention the authorities listed below.[1] And it is true that if the exhibition of gruesome photographs to the jury would serve no useful purpose in proving the crime, the trial court in the exercise of a sound discretion may exclude them. But in all the cases just cited they were admitted in evidence. And in this case they were admitted in these circumstances. When the trial began counsel for the appellant declined to make an opening statement, and objected to the introduction of his written confession on the ground that he had no counsel when he made it. In other words, at that stage of the case, appellant was putting the State on proof of the facts without any admissions. In these circumstances the admission of the photograph was not error.
Appellant's next briefed contention under two assignments is that instructions Nos. 8 and 11 given by the trial court on the defense of insanity were erroneous for specified reasons. But the only assignments in appellant's motion for new trial with respect to the instructions were assignments Nos. 12, 13 and 14, which merely charged in different forms that the verdict was contrary to the instructions. Under section 547.030 RSMo 1949, V.A.M.S., the motion for new trial in a criminal case "must set forth in detail and with particularity, in separate numbered paragraphs, the specific grounds or causes therefor." This has been the law ever since the enactment of Laws Mo.1925, p. 198, Sec. 4079. The foregoing assignments in the motion for new trial in this case wholly failed to do that, with respect to error in the instructions. In fact they did not complain of the instructions at all, but only that the verdict was contrary to them.
The next assignment in appellant's brief is that the court failed to instruct the jury as to the form of their verdict in the event the defendant should be found to have been insane at the time of the offense charged and to have subsequently become sane. *850 That is true. The court did give an instruction No. 10 telling the jury that if they found the appellant not guilty on account of insanity they should so state in their verdict, and should also ascertain from the evidence and state in their verdict whether he had or had not entirely and permanently recovered from such insanity. And in an instruction No. 12 they were told that if they acquitted the appellant on the ground of insanity they might use the following form: "We the jury find the defendant Oliver Morris not guilty on the ground that he was insane at the time of the commission of the offense charged, and further find that the defendant has not recovered from such insanity." (Emphasis ours.) But there was no instruction telling them what the form of their verdict should be if they found he was insane at the time of the commission of the offense but had recovered from such insanity.
On this point appellant's brief cites sections 546.070, 546.510 RSMo 1949, V.A. M.S. and State v. Webster, Mo.Sup., 230 S.W.2d 841, 842(2); State v. Harris, 232 Mo. 317, 321, 134 S.W. 535, 536(3, 4). These decisions announce the general rule that where the trial court in a criminal case undertakes to instruct on a question of law arising therein, the instruction should guide the jury fairly and present both sides of the proposition, regardless of whether the attention of the court is called to the matter.
Of the two statutes, § 546.070(4), supra, requires the trial court, whether requested or not, to instruct the jury in writing upon all the questions of law arising in a criminal case which are necessary for their information in giving their verdict. And § 546.510 provides that when the defendant shall be acquitted on the sole ground that he was insane at the time of the commission of the crime, the jury shall so find and by their verdict shall further find whether he has entirely and permanently recovered from such insanity; and if they find he has so recovered he shall be discharged; but if they find he has not recovered the court shall order him sent to a State Hospital.
We are of the opinion that the trial court's failure to inform the jury in the instructions of their duty to find in their verdict whether appellant had recovered from his insanity, if any, was not fataldespite that requirement in § 546.510, supra. The statute by its terms is based on the condition that the jury acquit the defendant on the sole ground that he was insane when he committed the crime, which they did not do here. By their verdict they merely found him guilty and assessed the punishment, which, under the instructions was a negation of the fact that he was insane when he committed the homicide.
The fifth assignment in appellant's brief complains that two of the State's counsel, Mr. Stevens and Mr. Abrams, made pointed remarks and comments to the jury in their arguments concerning the appellant's failure to testify at the trial. It is true that Mr. Stevens in his argument to the jury did refer twice to the appellant's failure to testify. But as to the first reference no objection was made. As to the second the defense merely said "exception". And the motion for new trial is entirely silent on both. With reference to Mr. Abrams, appellant's brief cites the following part of his argument: "The defendant admitted killing this man. He figured self-defense when he made the statement (the written statement to the police). That is in evidence. We had to put it in evidence. We knew Mr. Swearingen (appellant's counsel) wasn't going to put his client on the stand." (Parentheses ours). Again there was no objection.
This obviously was a comment on the appellant's failure to testify, but in our opinion appellant failed to save the point in his motion for new trial. He relies on Assignment No. 17 in the motion which read as follows: "Mr. Abrams' remarks to the jury were not supported by the evidence, were inflammatory and prejudicial. He called the defendant a killer. He misquoted the evidence of Aaron Morris and Raymond Morris (appellant's brothers). He stated to the jury `all you have to do is to sign a verdict of guilty and write in life', contrary to the instructions of the court." (Parenthesis ours). As will be seen this assignment does not complain of any references made by the State's counsel at any time to the *851 appellant's failure to testify. And the statute, § 547.030, supra, for over twenty-five years has expressly provided that assignments in the motion for new trial must set forth "in detail and with particularity * * the specific grounds or causes therefor."
The sixth assignment in appellant's brief is that the trial court erred in permitting the prosecuting attorneys to make inflammatory and prejudicial statements to the jury, which prejudiced the jury against the defendant. The brief cites two statements made by Mr. Stevens in argument, other than the two referred to above, but there is no complaint in the motion for new trial about them. With respect to Mr. Abrams, appellant cites the following statement made by him in his argument to the jury: "We have a vicious killer here, a man who will kill at the dropping of a hat and that is a good expression because it fits what happened in this case and you twelve people cannot under any circumstances give him an opportunity to go out and kill somebody else. He may turn around and kill his own brother if he is a vicious killer like that. It don't take much to kill whether it is insanity or not." No objection was made by defense counsel to this argument. Appellant's motion for new trial, in the aforementioned Assignment No. 17, does complain that the "remarks" were inflammatory and prejudicial.
It is true Mr. Abrams' statements in argument that appellant was a "vicious" killer and would "kill at the dropping of a hat", and that the jury should not give him an opportunity to kill somebody else because he might "kill his own brother if he is a vicious killer like that", were inflammatory and prejudicial. But no objection of any kind to them was interposed when they were made and the court could have palliated the error by a proper rebuke and strict directions to the jury to disregard the argument.
Different counsel represent appellant on this appeal. And it is urged that the cause should be reversed and remanded notwithstanding appellant's counsel below failed to object to the foregoing argument. Three decisions are cited.[2] Of these the Connor case was written in 1923, before our new trial statute was enacted in 1925. And the opinion therein does not disclose whether objections were made to the argument of counsel. But the briefs in that case, still on file here, show they were made.
In the Leonard case the opinion states that "if evidence is inadmissible the appellant must timely object to it and state the reason for the objection, otherwise it cannot become the basis for a new trial in either the trial or appellate court. * * * So it is with improper argument by the prosecutor, if it is not objected to error cannot be predicated on it." Then the opinion observes that part of the matters complained of on the appeal there were timely objected to. Continuing, the opinion says that "the prosecuting attorney may reply to any argument made by a defendant's counsel * * but he may not express his own personal opinion, not based on the evidence, or convey to the jury facts as of his own personal knowledge." But it adds: "Neither may he apply vituperative epithets, such as `scums and bums,' to witnesses, even though the denunciations are not objected to." This last observation in the Leonard decision was obiter dictum because the opinion had earlier stated that an objection had been made to the use of the words "scums and bums", and furthermore the opinion based its final ruling reversing the cause solely on matters objected to. This Leonard case cited three decisions[3] on the proposition that a prosecutor could not apply the epithet "scums and bums" to witnesses even though it was not objected to. We think they are not in point.
The Wellman and Webb cases[3] were decided in 1913 and were appeals from *852 Jackson County. The opinion in the Wellman case stated a practice seemed to have grown up on the part of public prosecutors in that county to shower abuse on witnesses who refused to testify for the State. Some of the argument had been objected to and some not. And the final ruling of this court was based on the misconduct of counsel and the invalidity of the information.
In the Webb case the prosecutor referred to altercations the defendant had had with "countless men", and the opinion states the prosecutor had caused 80 or more witnesses to be assembled in the court room and sworn as witnesses in rebuttal, and six of them had testified to the defendant's bad reputation for morals. When others were called, the court on the defendant's objection ruled no more would be heard. This case also was reversed for misconduct of State's counsel. In the Harmon case, the prosecuting attorney in argument called the defendant "a dirty dog" and "a mighty lowdown creature." The remarks were objected to and the objections were overruled, but the conviction was nevertheless affirmed.
In the third case cited by appellant, the Tiedt case, supra,[2] the prejudicial argument of the assistant prosecuting attorney was interrupted six times by objections of defense counsel, or the court.
In our opinion the argument of the prosecutor calling the appellant a vicious killer, and going further as set out above, was improper and probably would have constituted reversible error if it had been objected to at the time and the objection had been overruled. But it is clear that the new trial statute, Sec. 547.030, supra, has a purpose and means what it says in requiring the assignments therein to be detailed and particular, and to set out the specific grounds relied on. This, however, presupposes that trial objections will be made when the error occurs, or as soon thereafter as opposing counsel learn of it. Otherwise in a criminal case a powerful and unfair weapon would be put in the hands of defense counsel, akin to entrapment. By refraining from objecting at the time they could entice opposing counsel and even the trial court into error, and then raise the point for the first time by a proper assignment in the motion for new trial. Where the error is apparent and damaging an alert trial court in a criminal case should intervene even in the absence of an objection. But under the facts in this case we think and hold the error was not reversible.
The last assignment in appellant's brief is that there was no substantial evidence to support his conviction because he adduced substantial proof showing he was insane when he committed the homicide whereas the State failed to present evidence on that issue. And it is true the defense proved that while he was in the Army he had been examined in Government Hospitals in 1944, 1946, 1947 and found to be insane. However, the 1947 examination showed his insanity to be "in remission", which the custodian of the records defined as meaning "no per cent disabled." He was discharged to his mother, and his last examination, nearly three years later, on February 17, 1950, was almost four months after he committed the homicide here involved on October 15, 1949. At that examination he complained of headaches, heard voices saying "come here" like a phonograph; seemed withdrawn and depressed; was tearful during the interview; and there was "some blocking, physical and neurological, essentially negative." At that time he was working at a bakery in Kansas City. This examination was made on the patient's request for hospitalization, which was denied for lack of room in the hospital.
Dr. E. H. Trowbridge, Jr., a specialist in nervous and mental diseases, who had examined the appellant for the Government once in April, 1946, and then formed the opinion that he was suffering from dementia praecox or schizophrenia, testified as an expert witness for the defense. He said it was incurable, and that in his opinion although the patient had been restored to mental tranquility between that time and the date of the homicide, yet on the latter occasion his distorted attitude toward the outside world might return, and he might or would commit a homicide *853 on account of it, without a proper conception of the difference between right and wrongand that this would be true independent of his addiction to alcohol and narcotics.
The appellant's wife testified he called her after the homicide and said "he had got into a little trouble." He asked her what to do, and said he would be home, and he did come home. At her suggestion both of them went to the sheriff's office and he gave himself up. She said he was very temperamental and irritable and at times became violent. He "sees things", "hears voices and sees people that I don't see," this occurring two or three times a week mostly in the evening or at night. He thought every one was against him.
Appellant's brother Raymond Morris, who had been asleep at the crap game, was called by some one who told him there was fighting outside. He went out and saw Nolen lying on the ground. The appellant told him "he made me shoot him" and proposed that they take Nolen to the hospital. Then Raymond Morris called the police and took appellant home, and he and appellant and the latter's wife went to the sheriff's office. Raymond advised appellant not to make a statement until he had a lawyer. At the time appellant didn't know what to do. "He was extremely irritable, he was all shot to pieces, hard for him to talk." But he did make a statement. This brother testified appellant received an injury to his head when he was 16 years old. He was out of his mind for quite a few days. Since then there have been "recurrences of dizziness and nose bleeds, just plain crazyness, I would say."
Aaron Morris was present at the quarrel in the crap game and when Nolen left the house. Later Aaron and appellant went outside and he saw the altercation and shooting. Appellant was very nervous and was backing up. He tried to argue with Nolen. Aaron told him to watch out. Nolen kept advancing and appellant said "Stand back, I don't want any trouble." Nolen continued to advance and appellant shot him, though the witness had turned and didn't see it. Appellant was very nervous and said "What should I do?" and went up the street alone.
The foregoing testimony of the wife and brothers tended to support the defense of insanity and also self-defense. These defenses were inconsistent, but appellant was entitled to invoke both. State v. Wright, 352 Mo. 66, 75(2), 175 S.W.2d 866, 872(7). We do not agree that the only evidence in the case on appellant's mental condition was that adduced by the appellant's expert Dr. Trowbridge, who said an insane person is not capable of controlling his actions. That is true, but some of the testimony of the appellant's wife and two brothers is open to the interpretation that he did not shoot until compelled to do so in self-defense. On the other hand there was evidence showing appellant carried a revolver and used it with deadly effect very soon after he left the gambling house without avoiding an encounter with Nolen and before the latter had produced a weapon, if he had one. There was no proof of it.
Appellant testified he had been going to gambling houses and had carried the revolver for some time. Both appellant and his brother Aaron testified that Nolen merely threatened or struck with his fist at the outset. And appellant testified that later Nolen placed his hand in his back pocket and advanced toward him, and continued to advance in spite of the fact that he (appellant) held the revolver in his hand. The evidence was such that the jury reasonably could have disbelieved the testimony of the appellant and his brother Aaron.
In our opinion the case was for the jury and there was no reversible error. For these reasons the judgment is affirmed.
All concur.
NOTES
[1] State v. Bell, 359 Mo. 785, 788(5), 223 S.W.2d 469, 471(5); State v. Porter, 357 Mo. 405, 410(1), 208 S.W.2d 240, 242(1); State v. Bradley, 352 Mo. 780, 787(6), 179 S.W.2d 98, 101(8); State v. McDaniel, 336 Mo. 656, 669(2), 80 S.W.2d 185, 192(4); 2 Wharton's Criminal Evidence (10 Ed.) p. 1072, Sec. 518(a).
[2] State v. Connor, Mo.Sup.Div.2, 252 S.W. 713, 722 (9-12); State v. Leonard, Mo. Sup.Div.2, 182 S.W.2d 548, 550-551 (2-4); State v. Tiedt, 357 Mo. 115, 119-124(3), 206 S.W.2d 524, 526-528(1-5).
[3] State v. Wellman, 253 Mo. 302, 316-319, 161 S.W. 795, 800 (8, 9); State v. Webb, 254 Mo. 414, 426-431, 434-437, 162 S.W. 622, 625-627, 628(4-6); State v. Harmon, 317 Mo. 354, 360(8), 296 S.W. 397, 400 (11, 12).