**STATE of Missouri, Respondent,**

**v.**

**Lyman SMART, Appellant.**

**No. 47363.**

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Harold D. Jones, New Madrid, for appellant.

John M. Dalton, Atty. Gen., Richard R. Nacy, Jr., Sp. Asst. Atty. Gen., for respondent.

DALTON, Judge.

Defendant was charged with murder in the first degree of one Louis McGee in New Madrid County, Missouri, on November 28, 1957. See Section 559.010 RSMo 1949, V. A.M.S. He was convicted of murder in the second degree and his punishment fixed at ten years' imprisonment in the state penitentiary. He has appealed and first contends that the court erred in not sustaining his motion for judgment of acquittal offered at the close of all the evidence. See Supreme Court Rule 26.10, 42 V.A.M.S.

On the evening of November 28, 1957, there was a basketball game in the high school gymnasium at New Madrid, Missouri, attended by many young people, including appellant and McGee and most of the witnesses who testified in the case. The state's evidence tended to show that after the game the Pipkins brothers, "J. W.," "J. R." and Percy, accompanied by Clinton Farr and Zachariah Jenkins, went to the Happy Hollow Cafe (also referred to as a saloon) around 11 p. m. McGee was there when the three Pipkins' arrived and appellant arrived about 30 minutes later. Soon after appellant arrived, he and his brother Leonard, William Allen Dooley and a boy named Price got into an argument with McGee. Appellant and his brother Leonard had long knives, but after a time they put the knives in their pockets. Appellant then grabbed a chair and McGee also grabbed it and a scuffle ensued, but other parties separated them and no blows were struck. Later, McGee and the Pipkins brothers went outside to the Pipkins car to go home to Canalou, Missouri. However, the others came out and more words were exchanged between McGee and both Dooley and appellant and, after McGee had gotten into

and out of and been pulled back into the Pipkins car several times, the Pipkins car was able to leave and started for Canalou. The state's evidence showed that it took about 20 minutes to get McGee out of the cafe and into the car.

Seven persons were in the Pipkins car, McGee, the three Pipkins, Zachariah Jenkins, Clinton Farr and a boy named Evans. J. W. Pipkins was driving. The Pipkins car proceeded west from New Madrid to the Highway 61 junction, where it stopped at the intersection for a truck to pass. Meanwhile, the appellant and his companions had gotten into their car (driven by Leonard Smart) and it arrived at the junction behind the Pipkins car. When the Pipkins car stopped, someone (not identified) in the Smart car threw a bottle and struck the Pipkins car. At that time the Smart car, according to the state's witness, contained eleven to thirteen persons, including appellant and his brother Leonard and their two sisters, the two Price boys and two or three of their sisters and William Allen Dooley. The Pipkins car started up, turned south on Highway 61, intending to go to Canalou by way of Lilbourn, but when it reached the Greyhound Bus Station about 100 yards down the road, the boys all agreed to turn back to see why their car had been hit and "to see what they (those in the other car) were up to." J. W. Pipkins turned the car around and drove back north, past the junction, where the Smart car was still stopped. As the Pipkins car slowed down and passed the Smart car at the intersection, someone threw another bottle and again hit the Pipkins car. The Pipkins car, however, did not stop there, but went on north on Highway 61 and stopped at Riley's cotton gin, about a mile north of the Highway 61 junction with the road into New Madrid. All of the passengers, including McGee, got out and waited for the Smart car, which they assumed would arrive shortly and stop.

About two minutes later, the Smart car pulled up and stopped behind the Pipkins car and appellant and all of the others got

out. It was then about 12:30 a. m. It was a dark night and the car lights were left on the Smart car. McGee was standing to the right of the Pipkins car, facing south, when appellant got out of the Smart car. Appellant had a .22 rifle in his hands. He immediately walked to McGee and held this rifle about a foot away from McGee's face. McGee's hands were at his sides, and he had nothing in them. He told appellant to get the gun out of his face, but did not make any threats or call appellant any bad names. Appellant did not answer, but merely stood there, some ten seconds or longer. Another witness said five minutes or more. Appellant's sister and another man told appellant he would be a low-down dirty coward if he didn't shoot McGee. J. R. Pipkins tried to grab McGee by the arm and pull him away, but Dooley hit "J. R. " with a bottle. "J. R." had a lug wrench and struck Dooley with it. Leonard Smart joined Dooley against "J. R." and, in five or ten minutes of fighting, "J. R." lost the lug wrench. In the meanwhile, McGee was trying to get the rifle from appellant. He succeeded in grabbing it, but appellant then pulled it away from him and shot him. The bullet struck McGee in the left chest, and he fell to the ground. Appellant then jumped in the Smart car with the others and drove away. The Pipkins boys and those in their car took McGee to Doctor Chandler in New Madrid. The doctor found a bullet hole about three inches above the navel and a little to the left. McGee lost consciousness and died while on the doctor's table. Death was caused by internal hemorrhage from the bullet wound.

Concerning the shooting, other state's witnesses said that when the Smart car stopped all of the parties in the car got out and appellant and McGee began talking and arguing. Appellant held the gun on McGee. "It was slanted up like that." McGee took the end of the gun and pushed it out of his face. McGee kept saying "you will have to kill me before you run over me. * * * You will have to kill me first." They were on the gravel road and "they just kept backing up," appellant kept backing up. J. W. Pipkins was "trying to part them." One of the girls threw some rocks into the crowd, the car lights were turned off and McGee was shot. McGee did not have anything in his hands, but as long as the witness could see him, "he was just walking up on him" (appellant), until the witness heard a shot. McGee was five feet ten inches tall and weighed 150 pounds. His age was not stated, but he was not in school.

Another witness for the state, who got out of the Smart car when it stopped behind the Pipkins car, testified that after both groups were out of the cars, McGee and appellant started arguing at once and Pipkins and Dooley started fighting; and that appellant ran around the Smart car two or three times and got the rifle from the trunk and told McGee to stand back, but McGee kept going toward appellant. It was dark and witness was twelve feet away, but he didn't see anything in McGee's hand, nor did he see McGee strike appellant.

The evidence offered on behalf of defendant-appellant tended to show that when McGee entered the cafe he started arguing with Dooley, age 17 years, who had had prior trouble with McGee over Dooley's sister. The only knives displayed in the cafe were displayed by McGee and J. R. Pipkins. Appellant was outside when this occurred. Later, outside of the cafe when all involved were leaving, J. W. Pipkins showed a pistol to two of the girls in appellant's group. McGee also made threats outside the cafe and told appellant, if appellant and his crowd didn't fight them in town, they would follow them and fight out in the country, but appellant said he was going home. At the highway junction, after the Pipkins car turned south and the Smart car north, the Pipkins car turned around and followed and passed the Smart car, and stopped about one mile out of town at the gravel road intersection. The girls in the Smart car started crying and stated they were afraid the others would

shoot into the car with the pistol. They requested appellant to stop and let appellant's brother, Leonard Smart, try to talk the others out of fighting. When the Smart car stopped, various members of the McGee group were out with tire tools, a cotton hoe and other weapons. Dooley and Leonard Smart engaged in a fight with J. R. Pipkins, who had a tire tool, or a four-way lug wrench. McGee had a tire tool and started after appellant. Appellant ran and McGee pursued him, making threats and swinging at him with a lug wrench or tire tool. Appellant, in an effort to escape, circled the Smart car two or three times and ran across the ditch and back, while the others were fighting. Appellant reached into the trunk of the Smart car to get a weapon and found the rifle, which Dooley had used for rabbit hunting. Appellant did not know the rifle was in the trunk, but he grabbed it and McGee and he engaged in a scuffle over the gun. Appellant recovered it and later McGee grabbed it again and further scuffling followed. McGee struck appellant on the left arm with the tire tool and lug wrench and later struck him under the right eye, knocking him down. Appellant got up and took the gun from McGee and then continued backing up and telling McGee "to stay back off of me * * * that I didn't want to hurt him" while McGee kept coming on and making threats to the effect that, if appellant did not kill him, he would kill appellant and telling appellant to shoot. He was still coming toward appellant when appellant shot him. Appellant was afraid of McGee, afraid McGee was either going to hurt or kill him, "he seemed like he was trying to." At the time appellant fired he was not aiming the rifle at McGee and didn't intend to shoot him, he intended to frighten him. He said he shot in defense of himself. Appellant was 18 years old, 6½ feet tall and weighed 155 pounds.

In support of the contention that the court erred in overruling appellant's motion for a judgment of acquittal, the appellant says: "The trial court erred in re-fusing to direct a verdict of acquittal for defendant, for the reason that the only credible evidence of the State proved that the killing of the deceased by the defendant was justifiable self-defense, and the other evidence of the State's witnesses was incredible and conflicting and therefore not substantial evidence to support a conviction." Appellant cites State v. Rash, 359 Mo. 215, 221 S.W.2d 124, 126(4–6). In that case the testimony of the state's witness on essential facts "was not contradicted or disputed in any detail either by the state's other evidence or by the defendant's evidence"; there were "no conflicting facts and no conflicting inferences." A question of law was presented, and this court said "the state itself proved the killing was justifiable in self defense." No such record is presented here.

■ We must consider all the evidence in a light most favorable to the state, since a jury could find the facts in accordance with this evidence and disregard the conflicting evidence as unworthy of belief. State v. Buckner, 335 Mo. 229, 72 S.W.2d 73, 75. We find no merit in appellant's contention that the state's evidence was incredible and so conflicting as not to constitute substantial evidence. A determination as to what particular state's witnesses were to be believed was for the jury. It was the jury's province to resolve any conflicts in the evidence. State v. Hadley, Mo.Sup., 249 S.W.2d 857, 861 (4). It is apparent that the jury could find the facts to be (as one witness testified) that, immediately after the Smart car stopped behind the Pipkins car near Riley's gin, the appellant got out of the rear seat of the Smart car with the rifle in his hands; that he walked up to McGee, "stuck the gun in his face," and said nothing; that both stood there, possibly ten seconds or more, while McGee had no weapon, but had his hands by his side and kept telling Smart "to take the rifle out of his face"; and that, when Smart's sister and another person said "if he didn't shoot him he was a low-down dirty coward," the appellant shot Mc-

Gee. On this evidence the killing was not justifiable as a matter of law on any theory of self-defense and the motion for judgment of acquittal was properly overruled. See State v. Stallings, 334 Mo. 1, 64 S.W. 2d 643, 644(1).

Appellant next contends that the trial court erred in refusing to instruct on manslaughter for the reason that the evidence showed the deceased provoked defendant by striking him about the head and arm with an automobile lug wrench. The state insists that there was no evidence requiring the giving of an instruction on manslaughter; that there is no evidence "that appellant was in an emotional state when he shot McGee," or that he acted from heat of passion; and that all of the evidence points to self-defense rather than manslaughter. Respondent cites State v. Perno, Mo.Sup., 23 S.W.2d 87, 89; State v. Crouch, Mo. Sup., 124 S.W.2d 1185, 1187, and State v. Linders, Mo.Sup., 224 S.W.2d 386. These cases are distinguishable upon their facts.

■ If manslaughter is involved here, it may be defined as the killing of another intentionally, but in a sudden heat of passion due to adequate provocation and without malice. State v. Burrell, 298 Mo. 672, 252 S.W. 709, 711(2). "A provocation is deemed to be adequate, so as to reduce the offense from murder to manslaughter, whenever it is calculated to excite the passion beyond control. It must be of such a character as would, in the mind of an average just and reasonable man, stir resentment likely to cause violence endangering life, or as would naturally tend to disturb and obscure the reason and lead to action from passion rather than judgment, or to create anger, rage, sudden resentment or terror, rendering the mind incapable of reflection." Wharton on Homicide, 3rd Ed., 172; State v. Burrell, supra, 252 S.W. 709, 712; State v. Conley, 255 Mo. 185, 198, 164 S.W. 193, 197.

In State v. Porter, 357 Mo. 405, 208 S.W. 2d 240, 244, under the circumstances there shown, it was held that the deceased's "determined effort to take the keys from the defendant by force (the assault) were sufficient * * * to make the question of provocation one for the jury."

■ If there was substantial evidence of lawful provocation, the defendant was entitled to an instruction on manslaughter even though he claimed self-defense. State v. Creighton, 330 Mo. 1176, 52 S.W.2d 556, 562; State v. Porter, supra, 208 S.W.2d 240, 243; State v. Graves, 352 Mo. 1102, 182 S. W.2d 46, 55; State v. Littlejohn, 356 Mo. 1052, 204 S.W.2d 750, 752. And see State v. Forsythe, Mo.Sup., 251 S.W.2d 17, 19. "Where the evidence is substantial in tending to show personal violence, that is, tending to show a battery—violence to a person—initially inflicted upon the slayer by the deceased at the time of the homicide, the general rule is that a manslaughter instruction is called for; and this is true though the evidence consists of testimony of the defendant alone. Violence to the person is the standard exacted by the law as affording the basis for the inference of that heat of passion which reduces the grade of the crime in a homicide case from murder to manslaughter." State v. Taylor, Mo.Sup., 309 S.W.2d 621, 624; State v. Creighton, supra; State v. Littlejohn, supra, 204 S.W.2d 750, 752; State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38, 40(4); State v. Fuller, Mo.Sup., 302 S.W.2d 906, 908(2, 3).

■ The evidence hereinbefore reviewed clearly shows an assault and battery committed by the deceased upon the appellant immediately preceding the shooting. This evidence was therefore entirely sufficient to support an inference that the homicide was committed in a heat of passion and without malice. In such circumstances it was reversible error to fail to give an instruction on manslaughter. State v. Taylor, supra, 309 S.W.2d 621; State v. Sterling, Mo.Sup., 72 S.W.2d 70, 72; State v. Buckner, supra, 72 S.W.2d 73, 75; State v. Edwards, Mo.Sup., 226 S.W.2d 592.

Appellant further contends "that the trial court erred in refusing to instruct, at the request of defendant, on the turbulent and violent disposition of the deceased, where as here, the defense is self-defense." Appellant argues this point as follows: "the facts in the case at bar are * * * stronger than where only the 'reputation' of deceased is known to a defendant. Here, the defendant had an opportunity to personally observe, for several hours, the actions of the defendant (sic) toward others in his group, i. e., deceased wanting to fight at the cafe and the necessity of several members of deceased's party having to forcibly put deceased back into the automobile several times * * *. Defendant saw first hand the turbulent and violent disposition * * * the events which went on for several hours in the presence of defendant prior to the shooting. Personal observation by a defendant is more impressive and stronger, than the mere 'reputation' which he might have heard of."

Appellant has cited State v. Blair, Mo.Sup., 305 S.W.2d 435, 436(3) and State v. Parker, 358 Mo. 262, 214 S.W.2d 25, 27(4), but in this case the appellant did not submit to the court any such instruction as was given in the Blair case, or as was refused in the Parker case. The matter was not within Supreme Court Rule 26.02(6). It did not involve a question of law necessary for the guidance of the jury in returning their verdict, nor an essential element of the offenses submitted. State v. Mulconry, Mo.Sup., 270 S.W. 375, 378(9); State v. Swiney, Mo.Sup., 296 S.W.2d 112, 116(9, 10). While appellant orally requested the court "to instruct on the turbulent and violent disposition of the deceased," no such instruction was tendered. The request was, therefore, insufficient. State v. Wood, Mo.Sup., 266 S.W.2d 632, 637(7, 9); State v. Lee, 361 Mo. 163, 233 S.W.2d 666, 668(4); State v. Swiney, supra. Further, evidence that the victim of a homicide bore a reputation for being of turbulent or violent disposition or character is not admissible, unless the defendant knew of such reputation of the deceased, and such reputation cannot be proved by specific acts of violence. State v. Cavener, 356 Mo. 602, 202 S.W.2d 869, 874(6); State v. Blair, supra. No evidence was offered tending to show that the deceased bore a reputation for being of a turbulent or violent disposition and the court did not err in failing to instruct thereon. State v. Jenkins, 327 Mo. 326, 37 S.W.2d 433, 436(5).

Appellant next contends that "the verdict and conviction of the defendant is void as a matter of law," because the legal procedure followed in this case violated fundamental principles of fairness and "did not afford defendant due process, nor equal protection of law," in this, that the information upon which the prosecution was based was a nullity and void, because it was signed by Hal E. Hunter, Jr., as Assistant Prosecuting Attorney of New Madrid County, Missouri, and verified as such, when at the time of so signing said information the said Hal E. Hunter, Jr., though licensed to practice law, was forbidden to practice law in New Madrid County under Section 476.-290 RSMo 1949, V.A.M.S., by reason of the fact that he was then Clerk of the Magistrate Court of said county and acting as such; and that as such clerk, he had certified that the appellant had waived his preliminary hearing before said magistrate court, when in fact appellant was "an illiterate eighteen year old Negro boy * * * of below normal intelligence" who could not understand what a waiver of a preliminary hearing meant and when appellant had not waived such a hearing. Appellant insists that both the information and the verdict of the jury are void.

The record presented shows that appellant was represented by counsel in the Circuit Court of New Madrid County at the time of the trial and that he announced ready and went to trial. The information was not attacked in any manner at that time under Secs. 476.290 and 476.300 RSMo 1949, V.A.M.S., or under Supreme Court Rule 23.02, or on any other ground. Nor was there any contention or suggestion

prior to the trial that appellant had not been accorded a preliminary hearing or had not validly waived such a hearing. We find no evidence in the record to sustain appellant's contention that he is an illiterate Negro boy of below normal intelligence.

 The record shows that the first complaint made by appellant with reference to the information and verdict was in his unverified motion for a new trial, filed after the trial and after the jury had returned a verdict of guilty. It was therein alleged that defendant was an illiterate Negro boy; that he had not been afforded a preliminary hearing on the charge in question; and that the magistrate clerk who certified that defendant had waived his preliminary hearing was the same person that signed the information. Attached to the motion, as an exhibit incorporated by reference, was a certified copy of the transcript of the proceedings in the Magistrate Court of New Madrid County, which transcript had been filed in the circuit court in this cause. This transcript shows that defendant waived his preliminary hearing in the magistrate court and there is no evidence in this record to the contrary. The unverified allegations of a motion for new trial as to matters not shown by the record do not prove themselves. State v. Gaddy, Mo.Sup., 261 S.W.2d 65, 68(6); State v. Henderson, 356 Mo. 1072, 204 S.W.2d 774, 780(12). The exhibit attached to the motion tends to show that Hal E. Hunter, Jr., purported to act as Clerk of the Magistrate Court of said county on November 29, 1957, when the transcript was certified, while the information on which the cause was tried purports to have been signed and sworn to by Hal E. Hunter, Jr. as Assistant Prosecuting Attorney of New Madrid County on December 10, 1957. The record does not affirmatively show that the two mentioned positions were both held by the said Hal E. Hunter, Jr. on either of the two dates mentioned. However, any insufficiency of the information on the mentioned ground and any defects attending the waiver of the preliminary hearing were waived, when appellant (represented by counsel) announced ready and went to trial without objection. State v. Taylor, 362 Mo. 676, 243 S.W.2d 301, 302(1); Lambus v. Kaiser, 352 Mo. 122, 176 S.W.2d 494. The assignment is overruled.

For prejudicial error in failing to instruct on manslaughter, the judgment is reversed and the cause remanded.

All concur.